Nos. 42,348 and 42,472 (Consolidated)

SOUTHWESTERN BELL TELEPHONE COMPANY, a Corporation, *Appellee,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, HARRY G. WILES, Chairman and Commissioner, MARION BEATTY, Commissioner, and RICHARD C. BYRD, Commissioner, Members of the State Corporation Commission of the State of Kansas, *Appellants.*

(386 P. 2d 515)

40

Opinion filed November 2, 1963.

*Charles C. McCarter,* of Topeka, and *Laverne Morin,* of Wichita, argued the cause, and *George B. Collins,* of Wichita, was with them on the briefs for the appellant.

*F. Mark Garlinghouse,* of St. Louis, Missouri, argued the cause, and *Lester M. Goodell, Warren W. Shaw, William A. Gray, Jack C. Lorenz,* all of Topeka, and *John Hugh Roff, Jr.,* of St. Louis, Missouri, were with him on the briefs for the appellee.

The opinion of the court was delivered by

JACKSON, J.: These two appeals were consolidated after they reached this court. They have to do with a rate proceeding commenced before the State Corporation Commission of Kansas (hereinafter referred to as the Commission) by the Southwestern Bell Telephone Company (hereinafter referred to as the Company). On a petition for review the district court found the Commission's order unreasonable and unlawful and set it aside. The Commission has appealed. Appeal number 42,348 challenges the propriety of a temporary stay and injunction order. Appeal 42,472 challenges

the propriety of the conclusions of the court below on the merits of the case.

In order to insure a proper understanding of all of the issues involved, it will be necessary to refer to the procedural facts in some detail. The general and procedural facts do not appear to be in serious dispute.

The Company is a Missouri corporation, authorized to do business in the state of Kansas. It owns and operates an integrated telephone system within the states of Kansas, Missouri, Arkansas, Oklahoma, Texas, and a portion of Illinois. The portion of its system located in Kansas consists of various facilities and equipment comprising 185 exchanges serving 167 communities, and numerous toll lines furnishing both intrastate and interstate service to the public.

The American Telephone & Telegraph Company owns 99.99 percent of the Company's outstanding common stock. It also owns all, or a majority, of the voting stock in nineteen other telephone operating companies, and has a minority stock interest in two other telephone utilities, all of which comprise what is known as the Bell System in the United States. It also owns a minority interest in the Bell Telephone Company of Canada. A. T. & T. elects the board of directors of the Company, and, in addition, has one of its own directors on the board of directors of the Company.

A. T. & T. also owns 99.82 percent of the outstanding stock of Western Electric Company, Inc., and 50 percent of the common stock of the Bell Telephone Laboratories, Inc., the other 50 percent being owned by Western Electric Company, Inc.

Western Electric Company, Inc., manufacturers, purchases and distributes most of the apparatus, equipment and supplies required by all of the companies of the Bell System. Bell Telephone Laboratories, Inc., performs research, development and design work for the entire system. It also acts as the purchasing agent for the Bell System.

The Company operates as a subsidiary of A. T. & T. under what is commonly known as a license contract. Under this contract there are basically four types of services performed by A. T. & T. for the applicant: (1) Research in the development of telephonic equipment; (2) Advice and assistance in engineering, traffic, accounting, legal and other matters; (3) Furnish financial advice and assistance; and (4) Royalty free use of equipment covered by patents owned or licensed by A. T. & T. In consideration of these services under the

license contracts, each operating company, including this Company, is obligated to pay a fee of one percent on all local and toll service revenues less uncollectibles.

On May 28, 1959, the Company filed an application with the Commission requesting approval of an increase in intrastate telephone rates in Kansas sufficient to produce additional revenue in the amount of $5,800,000. Accordingly, the Commission ordered an investigation pursuant to G. S. 1949, 66-110, *et seq.*

On May 27, 1960, following extensive hearings on the application, the Commission issued an order which was served on the Company June 9, 1960. The order permitted increased rates sufficient to produce additional revenue in the amount of $1,321,437. On June 16, 1960, in accordance with the provisions of G. S. 1949, 66-118b, the Company filed an application for rehearing which the Commission denied on June 27, 1960. Pursuant to the Commission's order, the Company filed a new schedule of rates designed to produce approximately the additional amount authorized. On July 13, 1960, the Company filed with the District Court of Shawnee County a petition and application for review of the order made by the Commission on May 27, 1960.

On August 9, 1960, under the provisions of G. S. 1949, 66-118g, the Company filed an application for a stay of the Commission's order of May 27, 1960, and for an order enjoining the Commission "from interfering in any way with the Plaintiff in promulgating, charging and collecting fair and reasonable rates and charges for exchange telephone service until such time as the Defendant Commission shall establish lawful and reasonable rates or charges." On September 15, 1960, the Court issued its order, in conformity with the prayer of the Company's application, to become effective on the filing of a refunding bond in the amount of $3,000,000. The bond was filed and approved on September 16, 1960. On the same day the Commission filed a motion for a new trial which was overruled September 20, 1960. The Commission then perfected an appeal to this court from the stay order. This appeal, No. 42,348, was held in abeyance pending disposition of the controversy on the merits.

On September 19, 1960, the district court, with the consent of the parties, appointed a referee "to hear and examine the above review proceedings and to make a just and true report therein, according to the best of his understanding." The referee heard arguments of

council, considered the transcript and briefs, and on December 16, 1960, filed his report which included findings of fact and conclusions of law on all issues presented by the petition for review. No written notice was given the parties as to the filing of the report, although it does appear that the filing was orally called to their attention. The referee's findings and conclusions were not transmitted to the Commission as provided by G. S. 66-118k.

The referee's report, in the form of an opinion, with findings of fact and conclusions of law, was contrary to those of the Commission on most of the material issues challenged by the Company in its application for review.

On December 20, 1960, the Company filed a motion to modify the report of the referee and for judgment. On December 27, 1960, the Commission filed a motion to modify the report of the referee and for judgment. Neither party attacked the referee's report by a motion for new trial, so designated, but the motion of the Commission to modify the report of the referee and for judgment did allege grounds similar to those ordinarily found in a motion for a new trial.

The district court set the motions for hearing on January 4, 1961. At the hearing, the Company submitted its motion without argument. Counsel for the Commission argued its motion. On the same day the court entered judgment in which it stated that "the court, having examined the record, exercised its independent judgment with respect to the issues presented herein and being fully advised in the premises, finds that" the motions of both parties to modify the report of the referee should be denied. The district court adopted the report, findings of fact, and conclusions of law of the referee, and rendered judgment in favor of the Company.

On January 6, 1961, the Commission filed a motion for a new trial which the lower court overruled on the same day. The Commission served and filed its notice of appeal to this court on January 13, 1961. It then filed a four-volume abstract of the record May 12, 1961. Its abstract concluded with extended specifications of error which challenged the findings of fact and conclusions of law adopted by the court below. Thereafter, the Company filed a motion in this court to strike certain specifications of error and the abstract of the evidence filed by the Commission.

In response to the Company's motion to strike, the Commission raised a factual question as to its notice of the filing of the referee's

report. Numerous affidavits were filed by both parties. This Court then appointed a Commissioner (G. S. 1949, 60-3316) with authority to hold hearings and make recommendations on all issues presented in the proceeding on appeal.

The Commissioner filed an extensive report in the form of an opinion, covering all of the issues before this court. The parties filed supplemental briefs addressed to the Commissioner's conclusions and recommendations. The case was then argued at some length.

We will first give attention to the Company's motion to strike certain specifications of error and the abstract of the evidence filed by the Commission in this court. In support of its motion the Company contended that in the absence of a timely motion for a new trial addressed to the findings and conclusions of the referee "the only question now before this court is whether the findings and conclusions of the referee are sufficient, as a matter of law, to support the judgment of the district court."

At the suggestion of the parties, the Commissioner held a hearing and made an early determination of this question. He filed a report in which he recommended that the motion be overruled. The company has not discussed the matter in its supplemental brief.

The proceeding on application for review of an order of the Commission is not a trial, as that term is used in the code of civil procedure, but is more in the nature of an appellate review made on application rather than trial pleadings. The statute providing for review of the Commission's orders (G. S. 1949, 66-118c, *et seq.*) does not provide for reports by referees but requires the district court to transmit three copies of its *findings of fact and conclusions of law* to the Commission if it finds the order unreasonable. (*Central Kansas Power Co. v. State Corporation Commission*, 181 Kan. 817, 831, 316 P. 2d 277.)

A report of a referee in such cases can be nothing more than advisory, and a motion for new trial addressed to the findings of fact and conclusions of law of a referee is not necessary to protect the scope of this court's review.

The parties are in disagreement as to the jurisdiction, the power, and the restrictions which govern, and must be observed by, the Commission, the district court, and this court in a rate investigation.

It is doubtful if the record in this case discloses disputes of such a nature as to make the question material to the determination of the issues presented. There does not appear to be much dispute as to

facts. The dispute is largely over the manner in which the undisputed facts are to be applied. However, we will discuss a few general principles.

The regulation of public utilities, including the fixing of rates, is a legislative function. The legislature has seen fit to delegate its authority, with broad powers, to the State Corporation Commission. (G. S. 1949, 66-101.) The only statutory standard controlling the Commission in fixing rates for public utilities is that the rates must be just and reasonable (G. S. 1949, 66-113), and such standard as may be set forth in G. S. 1949, 66-128, for valuing public utility property.

The broad powers given the Commission by the legislature to regulate public utility rates is subject to constitutional guarantees and prohibitions. The question of possible confiscation of property or the impairment of vested rights presents issues which require the consideration of evidence. The taking of evidence is a responsibility which must be so conducted by the Commission that the decisions reached thereon are subject to complete review by the courts.

The legislature has provided definite procedure for the investigation of rates by the Commission. The statutory provisions relative to the procedure to be followed will be briefly considered. G. S. 1949, 66-111, provides that the Commission may:

". . . proceed to make such investigation, but no order affecting such rates, joint rates, tolls, charges, rules, regulations, and classifications, schedules, practices or acts complained of shall be made or entered by the commission without a formal public hearing, of which due notice shall be given by the commission to such public utility or common carrier or to such complainant or complainants, if any."

G. S. 1949, 66-112, provides for the manner of notice, investigation and hearing.

G. S. 1949, 66-113, provides for "orders and decisions" reduced to writing after such hearing and investigation, and for service of copies upon the public utility affected.

Although the statutes of this state may lack fixed standards for determining a reasonable return for the services rendered by a public utility, practice and custom, as approved by the decisions of this court, have established standards which have become a part of the law.

In a seriously contested rate investigation there must be a deter-

mination of (1) a rate base, (2) a fair rate of return, and (3) reasonable operating expense. In determining these factors, there are numerous elements pertaining to each which must be fairly and reasonably determined if a fair return is to result. Complete findings by the Commission on all essential elements which determine a fair return are required. The courts cannot perform the reviewing functions which the legislature has assigned to them in the absence of adequate findings.

The findings of the Commission must be based upon facts. It must be possible for the reviewing court to measure the findings against the evidence from which they were educed. Findings not based on evidence, but on suspicion and conjecture, are arbitrary and baseless.

We will not extend this opinion by extensive quotations from opinions of other state and federal courts on the subject. Those who wish to research the question further should see *Colorado-Wyoming Co. v. Comm'n.*, 324 U. S. 626, 89 L. Ed. 1235, 65 S. Ct. 850; *Panama Refining Co. v. Ryan*, 293 U. S. 388, 79 L. Ed. 446, 55 S. Ct. 241; *State Corp. Comm'n. of Kans. v. Federal Power Com'n.*, 206 F. 2d 690; *Mississippi River Fuel Corp. v. Federal Power Com'n.*, 163 F. 2d 433; *Company v. State*, 95 N. H. 353, 64 A. 2d 9; *Commonwealth Tel. Co. v. Public Service Comm.*, 252 Wis. 481, 32 N. W. 2d 247; *New England Tel. & Tel. Co.*, 115 Vt. 494, 66 A. 2d 135, and *A. T. & S. F. Ry. Co. v. Commerce Comm.*, 397 Ill. 406, 74 N. E. 2d 885.

In the regulation of public utility rates, the legislature has given the Commission power to determine facts and provided specific procedure for review of its orders by the courts.

Under the present statutory procedure, relating to rate regulation by the Commission, the proceeding is tried before the Commission in its entirety. The Commission hears the witnesses and takes all of the evidence. The district court can only review the record as transmitted to it by the Commission. (G. S. 1949, 66-118d.) Under the statutory procedure for review, the review by the district court is solely upon the record made before the Commission and for the purpose of determining whether or not "such order or decision is unlawful or unreasonable." (G. S. 1949, 66-118d, 66-118f.)

The power of the district court is governed by statute:

". . . no court of this state shall have the power to set aside, modify

or vacate any order or decision of the commission, except as herein provided."
(G. S. 1949, 66-118d.)

In *Atchison, T. & S. F. Rly. Co. v. State Corp. Comm.*, 182 Kan. 603, 322 P. 2d 715, the powers and duties of the district court were stated:

"In *Union Pac. Rld. Co. v. State Corporation Commission*, supra, this court held that the function of a district court in proceedings for review of an order made by the commission is limited to the inquiry whether the order made is lawful or reasonable and that in the exercise of that function the court is required to weigh evidence, review the entire record and base its decision upon all the facts and circumstances contained therein. In doing so it must weigh the evidence solely for the purpose of determining whether such order is reasonable, and only when the district court finds the order of the commission to be unlawful or unreasonable is it authorized to vacate or set aside the order. Upon doing so, however, the district court is obligated under the statute to make findings of fact and conclusions of law. (G. S. 1949, 66-118k.)" (pp. 610, 611.) (See also, *Chicago, R. I. & P. Rly. Co. v. State Corporation Commission*, 177 Kan. 697, 282 P. 2d 405.)

The end result to be determined by the review of the Commission's order is whether the order is reasonable or unreasonable. However, in making this determination, a detailed examination of the entire record is necessary in order to meet the constitutional guaranties and inhibitions.

The district court must consider the evidence and the law applicable to each element which make up the factors determinative of the end result, *i. e.*, the reasonableness of the order. If the Commission makes a material error, in considering the elements which make up the rate base, the rate of return, the operating expense or the operating income, the error will necessarily be reflected in its conclusion.

The district court in considering the record should not substitute its judgment for that of the Commission if the matter is within the realm of fair debate.

"Where its findings of fact are based upon substantial evidence and the other matters shown by the record with which that tribunal is authorized to deal, a court is not justified in setting its orders aside because the record shows that a different order or decision than the one made by the commission could fairly have been based thereon." (*Southern Kansas Stage Lines Co. v. Public Service Comm.*, 135 Kan. 657, p. 662, 11 P. 2d 985.)

The Commission's decisions involve the difficult problems of policy, accounting, economics and other special knowledge that go into rate making. It is equipped with a staff of assistants, with

experience as statisticians, accountants and engineers. The courts have no comparable suitability for making the determination.

The judicial duty to exercise independent judgment neither requires nor justifies disregard of the presumption of validity which is to be given the Commission's findings. The findings of the Commission, if supported by substantial evidence, should not be disturbed by a reviewing court.

It is the province of the legislature to determine how an appeal may be taken, and to designate the court to which such appeal shall be taken. (*City of Hutchinson v. Wagoner*, 163 Kan. 735, 186 P. 2d 243.)

The district court in reviewing an order of the Commission acts in an appellate capacity.

This court, on appeal from the district court in such cases, is reviewing the propriety of the decision of an inferior appellate tribunal. The legislature has not defined the limits or responsibility of this court on appeal. However, its responsibility is apparent. It must review the record for the purpose of determining whether the district court observed the requirements and restrictions placed upon it by statute. (*Thompson v. Commerce Com.*, 1 Ill. 2d 350, 115 N. E. 2d 622.)

The statute providing for proceedings on appeal from an order of the Commission is a directive to the district court as to the nature and extent of its review, and on appeal to the Supreme Court it must determine whether the district court has properly determined the matters to which its powers and duties extend. (*Birmingham Electric Co. v. Alabama Pub. Serv. Com'n.*, 254 Ala. 140, 47 So. 2d 455.)

If the findings of the district court are challenged on the basis that it did not give proper consideration to the presumption in favor of the Commission's findings, or if the district court substitutes its judgment for that of the Commission where the matter is in the realm of fair debate, this court must review the facts for the purpose of determining the issues so presented.

However, this court should not attempt to consider the appeal *de novo* and search the record for the purpose of determining the reasonableness of the Commission's order on the issues not challenged.

"In a case where there has been oral testimony and exhibits, the accuracy of which was questioned, this court has no authority to decide the issues

*de novo."* (*Chicago, R. I. & P. Rly. Co. v. State Corporation Commission,* 177 Kan. 697, 704, 282 P. 2d 405.)

This court will consider only the specific issues raised by the specifications of error. The abstract should contain all the evidence essential to such determination, but this court may examine the transcript for the purpose of enlightening itself on any issue In considering the veracity of the Commission's findings, the presumption as to their validity does not shift as between the first reviewing court (the district court), and this court.

Rate cases usually involve mixed questions of law and fact. If they are to be properly solved by this court on appeal it must frequently look below and beyond the findings of the district court. This rule was even applied when such cases were being tried in the district court *de novo.* (*Railroad Co. v. Utilities Commission,* 95 Kan. 604, 622, 148 Pac. 667.)

The dispute over the rate base, particularly the formula by which it is to be determined, presents the chief controversy in this case. This controversy hinges on the interpretation of G. S. 1949, 66-128, which provides:

"Said commission shall have the power and it shall be its duty to ascertain the reasonable value of all property of any common carrier or public utility governed by the provisions of this act used or required to be used in its services to the public within the state of Kansas, whenever it deems the ascertainment of such value necessary in order to enable the commission to fix fair and reasonable rates, joint rates, tolls and charges, and in making such valuations they may avail themselves of any reports, records or other things available to them in the office of any national, state or municipal officer or board."

It will perhaps be well to consider here the different methods of valuing the company's property which were submitted to the Commission.

Evidence was submitted as to the original cost of the company's property devoted to intrastate service in Kansas. The total original cost was depreciated by the accrued depreciation reflected by the books of the Company. This computation resulted in a figure of $144,148,582 as the original cost less depreciation. The Commission added to this amount the sum of $1,250,500 for materials and supplies, and arrived at a figure of $145,399,082, which it adopted as the rate base. The figures, insofar as they are arrived at by mathematical calculation, are not subject to dispute.

It will perhaps avoid confusion if we note here that the Commis-

sion did not include "plant under construction" in the rate base, neither did it include interest on "plant under construction" in income, and no allowance was made for working capital because it was amply covered by accruals of intrastate operating taxes.

The Company introduced evidence of the present fair value of its property devoted to intrastate service in Kansas by two different methods, (1) trended original cost, and (2) cost of reproduction new less depreciation, with adjustments to reflect present fair value.

The trended original cost is determined by trending the original dollar invested to reflect its present value or the result of inflation. The computation is made by applying a predetermined factor, known as "price indices," to the historical dollars invested which restates them in current value. The company submitted computations based on three different price indices. The distinguishing features of the three will not be considered in detail, but the results as applied to original cost resulted in the following increased figures:

| | |
|---|---|
| Consumer price index | $198,684,136 |
| Wholesale price index | 195,181,790 |
| Gross national products price deflator | 200,061,130 |

These figures do not include anything for going value.

The Commission found this method of determining a rate base unreliable and also found it unreliable for the purpose of determining the present fair value of the property. Other than the general objection to using the present fair value as a rate base it suggested that (1) "there was no direct connection between the wholesale index and the cost of construction of a telephone plant," (2) "trended original cost through the use of these indicies does not represent changes in price of telephone plant," and (3) that trended original cost has even less probative value than a reproduction cost study.

The Company also introduced evidence of a reproduction cost study prepared by W. L. Patterson, a senior engineer with Black and Veatch, consulting engineers of Kansas City, Missouri. He described the steps followed in determining the cost of reproduction new less depreciation as follows:

"The first step is to prepare a complete inventory of the items of property of the plant in service. The next step is to determine the cost of reproducing the items of property in the inventory as of the date of the appraisal. These costs are then applied to the inventory items to produce the reproduction cost of the property. The third step is to determine the physical condition of the property by inspection of representative samples of the inventory items. The

present condition of the property, after allowance for physical depreciation or deterioration and functional depreciation, is expressed as a percentage of the condition of new property. This is ordinarily referred to as the 'per cent condition' of the property. The appropriate per cent condition is then applied to the various classes of property on the inventory and the result produces the reproduction cost less depreciation."

Certain minor adjustments were then made to reflect other factors affecting value. On the basis of this study it was contended that the present fair value of the Company's Kansas intrastate properties as of June 30, 1959, was in the range of $205,000,000 to $213,000,000. In order to compare these figures with the rate base found by the Commission these would need to be deducted $21,000,000 allowed for going value; $6,380,701 allowed for construction work in progress; $923,604 allowed for working capital, and approximately $1,000,000 because of the use of an end period rather than an average test period rate base.

If these amounts are deducted from the reproduction cost figures, the value would be in the range of $175,500,000 to $183,500,000 as compared to the rate base found by the Commission in the amount of $145,399,082. A large part of the Company's properties has been constructed during the period of increased prices which is reflected in the book cost.

The Commission was critical of Patterson's cost of reproduction study. Among other things, it stated in its opinion:

"The staff contends that a rate base founded on the theory of reproduction cost new less depreciation involves speculation, individual judgment, and is conjectural and unrealistic. In view of witness Patterson's testimony we must agree with this conclusion. Reproduction cost new is based in large part upon the estimates, opinions and observations of individuals and even though expert means are employed there is considerable room for errors in judgment and divergencies in opinion in computing the reproduction cost and observed depreciation of a large and complex utility.

"Witness Duphorne admits that the determination of the present condition and obsolescence of the property requires the exercise of judgment. Furthermore, the reproduction theory is predicated upon reproducing the plant in its present form. Witness Duphorne admitted that if a plant were being rebuilt today, it would seldom be constructed as it was one year or ten years ago. Such theory tends to disregard eliminations which could be made in a complete reconstruction. In this case the reproduction cost new less depreciation computations assume the price by price reproduction of the applicant's plant at the substantially higher levels of present-day prices without consideration of the substantial decrease in operating expenses resulting in a greater return. Actually, the applicant would not rebuild its entire plant exactly as it exists today. It would take advantage of various technological advantages and lessons of

past experience. Numerous units of property would not be reproduced at all because improvements in production and transmission facilities would dictate the construction of modern units having better and greater efficiency. Such modern developments as microwave installations, could make large parts of the existing plant unnecessary, and where such items would simply be eliminated in an actual reconstruction of the plant, the reproduction cost theory carries them at this repriced cost. We conclude that the testimony introduced concerning reproduction cost is too speculative and conjectural to have probative value for rate fixing purposes. This theory is hypothetical in that it is based upon a condition which could not possibly exist—that is, the construction in a long period at one day's level of prices of the existing plant of a public utility without regard to its present efficiency."

The Company contends that G. S. 1949, 66-128, places a positive duty upon the Commission to determine the present fair value of the Company's property devoted to intrastate service in Kansas and to use such value as a rate base. In support of its contention it relies chiefly on the language used in the Commissioner's report which was appended to the opinion of this court in the case of *State, ex rel., v. Telephone Co.,* 115 Kan. 236, 223 Pac. 771, decided in 1924. In that case (p. 282) the commissioner states:

"The statute itself settles the question in my opinion. In section 28 of the Public Utilities Act (now G. S. 1949, 66-128), it is provided that 'said commission shall have the power and it shall be its duty to ascertain the reasonable value of all property of any common carrier or public utility governed by the provisions of this act,' and so forth.

"This section requires little observation. Certainly, if the legislature contemplated that the original cost basis should be used, it would have been needless to charge upon the commission the duty of ascertaining the reasonable value of the property; instead the legislature would have charged the commission with the 'duty to ascertain the *original* cost of all property.' This the legislature did not do."

We cannot see the logic in the Commissioner's statement made in the case. It might as well be said that if the legislature intended that only the present fair value be used, it would have charged the Commission with the "duty to ascertain the present fair value of all property." This the legislature did not do. It would appear more reasonable to assume that the legislature charged the Commission with the responsibility of ascertaining the reasonable value of all property for rate-making purposes. It was left with the discretion of the Commission as to what method of valuation would be used.

The Company states:

"The court explicitly approved all of the findings and conclusions of Judge

McDermott as Commissioner, except for one not at issue here. And the court further approved the report with the statement that it contained 'much information and reasoning that will be of value in understanding the opinion of the court.' Clearly then this court's holding should establish that the statutory language is mandatory in its requirement of reasonable value as a rate base."

With this statement we do not agree. The court did not adopt the statements of the commissioner as set out in his report. It did not adopt the commissioner's interpretation of G. S. 1951 Sec. 8356 (now G. S. 1949, 66-128), but rather found that the statute could not be considered because of the interpretation and application of the fourteenth amendment made by the Supreme Court of the United States. This court stated on page 246 of the opinion in *State, ex rel., v. Telephone Co.*, supra:

"That rule was followed in *Bluefield Co. v. Pub. Serv. Com.*, 262 U. S. 679, where that court said:

" 'The record clearly shows that the commission, in arriving at its final figure, did not accord proper, if any, weight to the greatly enhanced costs of construction in 1920 over those prevailing about 1915 and before the war, as established by uncontradicted evidence; and the company's detailed estimated cost of reproduction new, less depreciation, at 1920 prices, appears to have been wholly disregarded. This was erroneous. *Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission*, ante, 276. Plaintiff in error is entitled under the due process clause of the fourteenth amendment to the independent judgment of the court as to both law and facts." (p. 268.)

"The decisions of the supreme court of the United States with respect to the rules of law involved in deciding whether a rate is confiscatory are of course absolutely controlling upon state tribunals, the question being one of the interpretation and application of the 14th amendment to the federal constitution."

In 1924, when the decision in *State, ex rel., v. Telephone Co.*, supra was rendered, this court had no occasion to place an interpretation on the language used in G. S. 1949, 66-128, because it was bound by the United States Supreme Court's interpretation of the due process clause of the fourteenth amendment to the constitution of the United States requiring the use of the present fair value as a public utility's rate base. Regardless of the interpretation placed on the statute by this court, the interpretation would have been of no effect.

Neither the regulatory authorities nor the courts of this state were in position to give meaning to G. S. 1949, 66-128, because they were bound by the mandate of the Supreme Court of the United States to the use of "present fair value" in valuing public utility property for rate making purposes. However, that was changed in 1944. At

that time, the Supreme Court of the United States changed its position as to the necessity of the use of "present fair value" as an element of due process and made possible the consideration of applicable state statutes. (*Power Comm'n v. Hope Gas Co.,* 320 U. S. 591, 64 S. Ct. 281, 88 L. Ed. 333.) The case will be discussed later. It should be understood that the Hope case did not change the context or meaning of any existing state laws, but it did permit their application. This is the first time this court has been called upon to construe the language used in G. S. 1949, 66-128, since its interpretation would have any valid effect. The statute was enacted by the legislature in 1911. The question is, what did the legislature intend in 1911, when it charged the Commission with the duty of "ascertaining the reasonable value of all property of a common carrier or public utility" when the Commission deems such ascertainment necessary in order to fix a fair and reasonable rate?

The Company argues that in 1911 when the legislature enacted what is now G. S. 1949, 66-128, it codified existing federal constitutional requirements as to valuing public utility properties. The argument has merit and calls for a consideration of the federal decisions prior to 1911 for the purpose of determining whether definite constitutional requirements had been established. Prior to 1898, public utilities were demanding and receiving a return upon the book value of their properties. At that time there was no supervision over the books and accounts of a public utility. It was common knowledge that the books were adjusted to reflect fictitious values for the purpose of encouraging prospective purchasers of stocks and bonds, and for other advantageous reasons.

In 1898 the Supreme Court of the United States rendered its decision in *Smyth v. Ames,* 169 U. S. 466, 42 L. Ed. 819, 18 S. Ct. 418. In that case the court stated:

". . . It cannot, therefore, be admitted that a railroad corporation maintaining a highway under the authority of the State may fix its rates with a view solely to its own interests, and ignore the rights of the public. But the rights of the public would be ignored if rates for the transportation of persons or property on a railroad are exacted without reference to the fair value of the property used for the public or the fair value of the services rendered, but in order simply that the corporation may meet operating expenses, pay the interest on its obligations, and declare a dividend to stockholders.

"If a railroad corporation has bonded its property for an amount that exceeds its fair value, or if its capitalization is largely fictitious, it may not impose upon the public the burden of such increased rates as may be required for the purpose of realizing profits upon such excessive valuation or fictitious capitaliza-

*tion;* and the apparent value of the property and franchises used by the corporation, as represented by its stocks, bonds, and obligations, is not alone to be considered when determining the rates that may be considered when determining the rates that may be reasonably charged. . . ." (pp. 544, 545.)

The court stated further:

"We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And, in order to ascertain that value, *the original cost of construction,* the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. . . . (Emphasis ours.) (pp. 546, 547.)

Although in the Smyth case the Supreme Court of the United States discredited the use of original cost for rate-making purposes because of fictitious capitalization, it did not lay down the rule later announced that only present fair value met federal constitutional requirements. It did in fact state that "the original cost of construction" was a "matter for consideration."

The Supreme Court of the United States again had occasion to consider the question in 1903 in the case of *San Diego Land & Town Co. v. Jasper,* 189 U. S. 439, 47 L. Ed. 892, 23 S. Ct. 571. We quote from the case at some length because of its importance here:

"The main object of attack is the valuation of the plant. It no longer is open to dispute that under the Constitution 'what the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public.' *San Diego Land & Town Co. v. National City,* 174 U. S. 739, 757, 43 L Ed. 1154, 1161, 19 Sup. Ct. Rep. 804, 811. That is decided, and is decided as against the contention that you are to take the actual cost of the plant, annual depreciation, etc., and to allow fair profit on that footing over and above expenses. We see no reason to doubt that the California statute means the same thing. Yet the only evidence in favor of a higher value in the present case is the original cost of the work, seemingly inflated by improper charges to that account and by injudicious expenditures (being the cost to another company which sold out on foreclosure to the appellant), coupled with a recurrence to testimony as to the rapid depreciation of the pipes. In this way the appellant makes the value over a million dollars. No doubt, cost may be considered, and will have more or less importance according to circumstances. In the present case it is evident, for reasons, some of which will appear in a moment, that it has very little importance indeed.

"The property of the Company and its predecessor consisted, not only of the waterworks, but a large amount of land. On the evidence the waterworks may be estimated at about a quarter of the total value. The earlier Company was unable to raise the money needed. Its bonds for $500,000, secured by mortgage, were not worth more than 95, and an attempt to raise a further loan on mortgage failed. The whole amount that the market and interested stockholders were willing to lend on all. the security it could offer was $650,500. The Company was put into the hands of a receiver, who issued some certificates, which, we infer, were made a paramount lien. Then, by arrangement with the stockholders who were willing to go on, the mortgage was foreclosed and all the property was sold to those stockholders for the nominal sum of $889,-163.33, which was equal to the amount of outstanding certificates and bonds, and was paid by turning them in. This was in 1897 a few months before the passage of the ordinance complained of. The purchasers organized the present corporation, and the above-mentioned sum is the cost of the land and waterworks to it. The appellant protests that this is not a fair value for the property of the company. We doubt whether it is not a liberal allowance. The officers of the two companies at the time thought that they got more than they could have got in any other way. But at all events, it is decided that the price is evidence, we might say more important evidence than the original cost . . ." (pp. 442, 443.)

It is apparent that the court in the San Diego Land case discarded original cost because it was "seemingly inflated by improper charges to that account and injudicious charges to expenditures." It did not require a determination of present fair value, but used the cost to the present owners, which, it stated, was a "nominal sum."

The Company next calls our attention to the case of *Willcox v. Consolidated Gas Co.*, 212 U. S. 19, 53 L. Ed. 382, 29 S. Ct. 192, decided in 1909. In that case the court stated:

"And we concur with the court below in holding that the value of the property is to be determined as of the time when the inquiry is made regarding the rates. If the property which legally enters into the consideration of the question of rates has increased in value since it was acquired, the company is entitled to the benefit of such increase. This is, at any rate, the general rule. We do not say there may not possibly be an execption to it *where the property may have increased so enormously in value* as to render a rate permitting a reasonable return upon such increased value unjust to the public. How such facts should be treated is not a question now before us, as this case does not present it. We refer to the matter only for the purpose of stating that the decision herein does not prevent an inquiry into the question when, if ever, it should be necessarily presented." (Emphasis ours.) (p. 52.)

This case does not indicate an intention to declare present fair value as the only rate base that would meet the constitutional requirement of due process. That rule was made definite later. There were no decisions prior to 1911 that would lead the Kansas legis-

lature to believe that *present fair value* was the only factor that could be considered in arriving at a rate base.

We do not believe it was the intention of the legislature to restrict the use of but one factor, present fair value, in determining a rate base. Later the Supreme Court of the United States did indicate that present fair value was the only factor compatible with the requirements of the fourteenth amendment to the Constitution of the United States. In the Minesota Rate Cases, decided in 1913 (*Simpson v. Shepard*, 230 U. S. 352, 57 L. Ed. 1511, 33 S. Ct. 729), it was stated by the Supreme Court:

". . . As the company may not be protected in its actual investment, if value of its property be plainly less, so the making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost. The property is held in private ownership, and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law . . ." (p. 454.)

In *Bluefield Co. v. Pub. Serv. Comm.*, 262 U. S. 679, 67 L. Ed. 1176, 43 S. Ct. 675, decided in 1923, the Supreme Court quoted with approval the statement made in the Minnesota Rate Cases and stressed the principle there announced.

The law thus remained until 1944 when the Supreme Court handed down its decision in *Power Comm'n v. Hope Gas Co.*, 320 U. S. 591, 88 L. Ed. 333, 64 S. Ct. 281. A few quotations from the opinion in that case may be helpful here:

"The Commission established an interstate rate base of $33,712,526 which, it found, represented the 'actual legitimate cost' of the company's interstate property less depletion and depreciation and plus unoperated acreage, working capital and future net capital additions . . . (p. 596.)

. . . . . . . . . . . . . .

"Hope introduced evidence from which it estimated reproduction cost of the property at $97,000,000. It also presented a so-called trended 'original cost' estimate which exceeded $105,000,000. The latter was designed to 'indicate what the original cost of the property would have been if 1938 material and labor prices had prevailed throughout the whole period of the piecemeal construction of the company's property since 1898.' 44 P. U. R. (N. S.) pp. 8, 9. Hope estimated by the 'per cent condition' method accrued depreciation as about 35% of reproduction cost new. On that basis Hope contended for a rate base of $66,000,000. The Commission refused to place any reliance on reproduction cost new, saying that it was 'not predicated upon facts' and was 'too conjectural and illusory to be given any weight in these proceedings.' *Id.*, p. 8. It likewise refused to give any 'probative value' to trended 'original cost' since it was 'not founded in fact' but was 'basically erroneous' and produced 'irrational results.' *Id.*, p. 9 . . ." (pp. 596-597.)

"The Circuit Court of Appeals set aside the order of the Commission for

the following reasons. (1) It held that the rate base should reflect the 'present fair value' of the property, that the Commission in determining the 'value' should have considered reproduction cost and trended original cost, and that 'actual legitimate cost' (prudent investment) was not the proper measure of 'fair value' where price levels had changed since the investment. (2) It concluded that the well-drilling costs and overhead items in the amount of some $17,000,000 should have been included in the rate base. (3) It held that accrued depletion and depreciation and the annual allowance for that expense should be computed on the basis of 'present fair value' of the property, not on the basis of 'actual legitimate cost.' " (pp. 599-600.)

". . . The heart of the matter is that rates cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings under whatever rates may be anticipated.

"We held in *Federal Power Commission v. Natural Gas Pipeline Co.,* [315 U. S. 575, 86 L. Ed. 1037, 62 S. Ct. 736], *supra,* that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of 'pragmatic adjustments.' *Id.,* [315 U. S. 575, 586, 86 L. Ed. 1037, 62 S. Ct. 736]. And when the Commission's order is challenged in the courts, the question is whether that order 'viewed in its entirety' meets the requirements of the Act. *Id.* p. 586. Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling . . ." (pp. 601-602.)

". . . Moreover, this Court recognized in *Lindheimer v. Illinois Bell Tel. Co.,* [292 U. S. 151, 78 L. Ed. 1182, 54 S. Ct. 658], *supra,* the propriety of basing annual depreciation on cost. By such a procedure the utility is made whole and the integrity of its investment maintained. No more is required. . . ." (p. 606.)

The parties have cited many cases from other states in support of their contentions as to how the phrase "reasonable value," as used in G. S. 1949, 66-128, should be interpreted. The decisions are not of much assistance at this point. Numerous and varied interpretations are placed on the words "fair value" and "reasonable value." There is little similarity in the language used in the statutes of the various states. The state of Mississippi appears to have had a statute most similar to that of Kansas. The statute provided in part:

"Rates prescribed by the Commission shall be such as to yield a fair return to the utility furnishing service upon the reasonable value of the property of the utility used or useful in furnishing service." (Code of 1942 Recompiled Sec. 7716-08.)

The Supreme Court of Mississippi in *Sou. Bell v. Public Ser. Comm.,* 237 Miss. 157, 113 So. 2d 622, considered the statute and stated:

"In our opinion those contentions (relating to the adoption of fair value) are without merit. Our statute does not bind the commission to the use of

any particular formula in determining the reasonable value of the property of a public utility for rate making purposes. Our statute merely provides that the rates prescribed shall be such as to yield a fair rate of return upon the reasonable value of the property used and useful in furnishing service, and that the commission, in arriving at such rate base 'shall give due consideration to all elements that are generally considered in determining the rate base for rate making purposes.' There are a number of formulas which are useful in the determination of the reasonable value of a utility's property for rate making purposes. No public utility has a vested right to any particular method of valuation. *City of Fort Smith v. Southwestern Bell Telephone Company* (1952), 220 Ark. 70, 94 PUR (NS) 214, 247 S. W. 2d 474."

The foregoing Mississippi decision was quoted with approval as recently as February 20, 1961, in *U. Gas Corp. v. Miss. Pub. Serv. Comm.*, 240 Miss. 405, 127 So. 2d 404. The Court said in considering an amended statute:

"The leading case in this state on utility rate regulation is *Southern Bell Telephone and Telegraph Co. v. Mississippi Public Service Commission,* 237 Miss. 157, 113 So. 2d 622 (1959) (sometimes called the Mississippi Southern Bell case. It was there held that the Mississippi statutes do not bind the Commission to the use of any particular formula in determining the reasonable value of the property of a public utility for rate making purposes. There are a number of useful formulae, including depreciated original cost, sometimes known as net investment, or original cost less depreciation; reproduction cost of the property less depreciation; depreciated prudent investment; trended original cost less depreciation; and others. The statute simply provides that the rate prescribed shall be such as to yield a fair rate of return upon the reasonable value of the property used and useful in furnishing service. The 1956 Act does not impose upon the Commission requirement that the so-called fair value formula of *Smyth v. Ames,* 169 U. S. 466, 18 S. Ct. 418, 42 L. Ed. 819, (1898) with it emphasis upon reproduction cost new, should be adopted as the measure of the rate base. Evidence of reproduction cost new less depreciation is admissible in hearing on a rate case, but its probative value is primarily to be determined by the Commission. It is not required to accept this opinion evidence with appraisal, but can weight and evaluate it.

"In the Mississippi Southern Bell Case the Commission admitted opinion evidence on reproduction cost new, but after considering it, concluded the evidence was conjectural, speculative, unrealistic and unreliable. Hence the agency rejected that evidence, and fixed that rate base on original cost less depreciation. That action was affirmed by this court." (pp. 419-420.)

Under the broad powers which the legislature has vested in the Commission it must be concluded that the Kansas legislature did not intend to restrict the Commission as to the formula to be used in arriving at the reasonable value of a public utility's property for rate-making purposes. "Reasonable value" as used in G. S. 1949,

66-128 is the reasonable value of the public utility's property as that term is understood for the purpose of determining a fair and reasonable return.

The Company relies on five cases from five different states to support its contention. This court has carefully considered the cases. There is little similarity in the language used in the statutes of the various states. We will, for the purpose of brevity, confine our presentation to the general conclusions reached in the opinions.

In *State v. Public Service Commission*, Mo., 308 S. W. 2d 704, it is stated:

"This does not mean that such value must be based primarily upon either original cost or reproduction cost less depreciation. It was aptly said in Railroad Commission v. Houston Natural Gas Corp., Tex. Sup., 289 S. W. 2d 559, 572; '[T]he original cost test deprives the equity ownership of any chance to fluctuate with changing economic conditions and makes it in fact very like a fixed indebtedness instead of an equity ownership. On the other hand, the test of reproduction cost new adjusted to actual age and condition during inflationary periods could be too large a burden on the public and during deflationary periods unfair to utility investors. So the burden of the cases is that the solution falls as a matter of judgment somewhere between these two brackets. This allows utility property to fluctuate in value but tends to even out the curve and flatten the extremes of economic cycles.'

"Thus it is that the courts do not and should not circumscribe regulatory agencies by any hard or fast formula. Each case must be determined upon its own facts and, oftentimes, varying factors that may be peculiarly relevant to a reasoned determination of the issue of 'just and reasonable' rates under conditions then existing. It follows as a matter of course that neither the rate base nor the return to the company is to be fixed by 'rule of thumb' or in the interest of expediency." (p. 718.)

In *State v. Public Service Comm.*, 131 Mont. 272, 309 P. 2d 1035, it is stated:

"The language of the statute is clear that the Commission shall determine '*the value of the property of every public utility actually used and useful for the convenience of the public.*' This court has previously determined that this means the present fair value of the utility's property. *Tobacco River Power Co. v. Public Service Comm.*, 109 Mont. 521, 98 Pac. (2d) 886. Neither the Public Service Commission nor the utility company is limited to nor bound by any particular method in arriving at the solution of the question of value. *Tobacco River Power Co.* case, supra.

"The cost of reproduction new, less depreciation, is usually regarded as one of the most important, if not the dominant, factor, in the determination of value. 51 C. J. 17. Under the section of the Montana Code just cited, assessment rolls are likewise admissible as evidence of value, but of course are not exclusive. . . . Original cost, assessment values, cost of reproduction new, prudent investment theory, public records mentioned in section 3884

[Revised Codes of 1935, now R. C. M. 1947, § 70-106], supra, and opinions of value, are all means to an end, namely the determination of value. We can find no error in the procedure of the court in allowing evidence of cost of reproduction new, less depreciation, to be admitted as evidence of value.' *Tobacco River Power Co. v. Public Service Comm.*, 109 Mont. 521, 529, 530, 98 Pac. (2d) 886, 890, supra." (pp. 276, 277.)

In *Pittsburgh et al., Aplnts., v. PA. P. U. C.*, 158 Pa. Super Ct. 229, 44 A. 2d 614, it is stated:

". . . Any construction of that Act of Congress has no application to the language of our Public Utility Law or its binding effect upon us. We have adhered to the view that when the legislature wrote *fair value* into the Public Utility Law it adopted the then settled construction of the appellate courts of this State and intended the same meaning of *fair value* as under the prior Public Service Act. Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS 552. Decisions of the Supreme Court of the United States, in other cases, accepting standards other than *fair value* in the sense of our statute, do not change the present law of this Commonwealth; that remains a question for the legislature, so long as our views are unmodified by a court of higher authority." (p. 236.)

In *Northern States Power Co. v. Public Serv. Comm.*, 73 N. D. 211, 13 N. W. 2d 779, it is stated:

"In the former appeal in this case [*Northern States Power Co. v. Board of Railroad Com'rs.*, 71 N. D. 1, 298 N. W. 423] we held that the fair value formula as set forth in Smyth v. Ames, 169 US 466, 42 L Ed 819, 18 S Ct 418, and as modified by subsequent decisions of the Supreme Court of the United States had been adopted by the Legislature of this State in 1919 as the formula for determining rate bases for public utilities. There can be no doubt today, but that, insofar as the federal courts are concerned, the 'ghost of Smyth v. Ames had been laid.' Federal Power Commission v. Natural Gas Pipeline Co., 315 U. S. 575, 86 L. Ed. 1037, 62 S. Ct. 736; Federal Power Commission v. Hope Natural Gas Co., 320 U. S. 591, 88 L. Ed. 333, 64 S. Ct. 281. That circumstance, however, has no bearing upon the question before us now. We are concerned with the law of this State as enacted in 1919. In the decision in the former appeal in this case we gave extended consideration to the construction of this statute and we see no reason now to modify that construction.

". . . A finding of value cannot be reached merely by the solution of an algebraic equation which is universal in its application. It is not fanciful to say that in many instances actual value may properly be found at levels which are below both reproduction cost depreciated and historical cost depreciated. This is particularly true where depreciation is based solely upon physical deterioration and in a field in which technical advances are being made with such rapidity that the toll taken by obsolescence far exceeds that taken by actual physical depreciation. We do not, however, suggest that this situation exists in the present case. *Historical cost and reproduction cost are both major factors but the weight which shall be given to each in the fair value formula*

*can only be determined by judgment exercised in the light of the circumstances in which they rest. That is the judgment which the Commission exercised in this case."* (Emphasis ours.) (pp. 225, 226.)

In *Matter of New York Tel. Co. v. Public Serv. Comm.,* 309 N. Y. 569, 132 N. E. 2d 847, it is stated:

"The concept of value, of course, is quite different from that of cost, and the expression 'actually used' connotes a present use. Thus the commission is required to receive proof of reproduction cost less depreciation as some evidence of present value in the case of utility property which, due to the unique restrictions placed upon it by law, cannot readily be valued by other usual methods, such as so-called 'market,' 'sales' or 'exchange' value.

"This is not to say that the rates must be *based* upon reproduction cost less depreciation. As the commission itself states, *it is under no statutory or other obligation to confine itself to consideration of any particular one of the various alternative rate bases.* All that the statute says is that the commission shall 'determine the just and reasonable rates' with 'due regard, among other things, to a reasonable average return upon the value of the property actually used in the public service.' 'Due regard' to one factor 'among other things' requires consideration of that factor. It is by no means controlling. While price indices rise in some periods, in others the general level of prices declines. What consideration is to be given to 'value' 'among other things' is for the commission to decide, having in mind that the overriding principle governing its primary duty is that it shall determine 'just and reasonable rates'." (Emphasis ours.) (pp. 578, 579.)

The statements in the above cases do not appear to be in serious conflict with what has heretofore been said nor that which follows.

The following cases reflect the proper approach in determining the reasonable value of a public utility's property for rate-making purposes:

"The fair value of the property upon which a utility in this Commonwealth is entitled to receive a fair return is the value existing at the time the rates are established or at the time the value is in issue. *Citizens Water Company v. Pennsylvania Public Utility Commission,* 181 Pa. Superior Ct., 301, 306, 124 A. 2d 123. Fair value for rate-making purposes, however, is not the literal present fair value for any particular purpose, but it is the fair value of the property as that term is understood for rate-making purposes; in this respect fair value has a connotation peculiar to rate proceedings. There is no particular formula by which the Commission is bound in fixing the rate base; all facts which have a relevant bearing on fair value, as that term is used in rate proceedings, should be considered." (*Pittsburgh, Aplnt. v. Pa. P. U. C.* (*et al., Aplnt.*) 187 Pa. Superior Ct. 341, 144 A. 2d 648.)

With regard to the question of the weight to be attached to reproduction cost new, we think that little need be added to what was said in the *Chesapeake & Potomac Telephone* case and in the *Consolidated Gas Electric Light & Power Co.* case, both above cited. The Commission is not tied to any one formula in ascertaining fair value; reproduction cost new, less depreciation,

is one of the factors traditionally taken into consideration, but it is not necessarily controlling. Its weaknesses have been pointed out in many cases, but on this subject we need to no more than refer to the two recent decisions of this Court cited above." (Hagerstown v. Public Serv. Comm., 217 Md. 101, 141 A. 2d 699.)

"The Board is not bound to any particular formula or combination of formulae in determining the fair value of the Company's property. *State v. N. J. Bell Tel. Co. supra*, 30 N. J. at *page* 29 (152 A. 2d at page 42). That determination must, however, be bottomed upon substantial, competent, relevant evidence. Reproduction cost is one guide to fair value, but not a measure. *New Jersey Bell Telephone Co. v. Department of Public Utility Com'rs., supra*, 12 N. J. at *page* 586, (97 A. 2d at page 611). There is little to recommend the use of depreciated cost reproduction figures for items that no one would want to reproduce as a basis for the Company's rate base. However, the Board may, but it is not bound to, 'adhere to a net investment formula, which has been the dominant yardstick in *New Jersey State v. N. J. Bell Tel. Co., supra*, 30 N. J. at *page* 30, (152 A. 2d at page 43). The board's determination on the fair value of the Company's assets and its decision on the non-applicability of the depreciated reproduction cost rate base, if properly founded in the evidence, is beyond judicial inference." (Revision in Rates filed by *In re Plainfield—Union Water Co.*, 57 N. J. Super. 158, p. 176, 154 A. 2d 201.)

"From all of the cases and authorities which we have studied, we reach the conclusion that no public utility has a *vested right* to any particular method of valuation. The aim of a regulatory body is to determine a fair valuation; and the method of calculation may vary as between the type of the utility involved and the economic conditions existing." (*City of Fort Smith v. Southwestern Bell Telephone Company*, 220 Ark. 70, 84, 247 S. W. 2d 474.)

The Commission states in its opinion:

"The rate of return to be applied to the rate base will be in keeping with the rate base determined to insure that the result is just and reasonable. The element of inflation, of course, is taken into consideration in the determination of the cost of the capital required in order to finance a construction program of the Applicant. Witness Waters noted that this type of rate base is in accord with general accounting procedures. The Applicant presented testimony of great length concerning the presence of inflation. This Commission is aware of the fact that inflation exists but it has had little effect upon the present surviving dollars invested in plant in service dedicated to the public use. Some $138,066,445 of dollars were invested subsequent to 1946. This represents a total of 62.04 per cent invested since the last general rate case and 83.73 per cent of the present capital investment as of December 31, 1958, was made subsequent to World War II. The factor of inflation is taken into consideration in the determination of cost of capital and a fair rate of return."

The major portion of the Company's plant was constructed during the period of inflated prices. Of the 16.5 per cent constructed prior to 1940, $12,213,642 constituted construction during or prior to 1929. It is during this period of construction that the added cost of re-

construction would have the greatest impact. The Commission's suggestion is quite applicable:

"Actually, the Applicant would not rebuild its entire plant exactly as it exists today. It would take advantage of various technological advantages and the lessons of past experience. Numerous units of property would not be reproduced at all because improvements in production and transmission facilities would dictate the construction of modern units having better and greater efficiency."

The Commission did not ignore the evidence submitted as to the cost of reproduction. It gave many reasons why it did not find the cost of reproduction as suitable a measure of reasonable value as actual cost under the circumstances in this case. The courts should not substitute their judgment for that of the Commission where the matter is in the realm of fair debate.

After a study of the authorities since the decision in the Hope case *supra* (1944) and a complete review of the record in this case, it is concluded in connection with the rate base:

Reasonable value for rate-making purposes is not the literal present fair value for each and every purpose, but is the reasonable value as that term is understood for the purpose of determining a fair and reasonable return. In this respect, the term "reasonable value" as used in G. S. 1949, 66-128, has a connotation peculiar to rate proceedings.

A public utility has no vested right to any particular formula or method of valuation. Neither is the Commission bound to any particular formula or combination of formulae in determining the reasonable value of a company's property. The Commission should receive and consider all evidence which has a relevant bearing on reasonable value of a company's property. The Commission should be used under the facts and circumstances in the case. If the Commission finds that a rate base founded upon depreciated reproduction cost is not applicable or contains weaknesses and the finding is based upon substantial evidence, it should be free from judicial interference.

The district court erroneously concluded that the Commission was required by law to determine a rate base by the use of estimated reproduction cost new less depreciation or some related formulae, and erroneously concluded that the use of a rate base established by original cost less depreciation rendered the order void as a matter of law.

The Commission made no allowance in the rate base for going concern value. The reviewing court found as a fact:

"Going concern value is an element of value which should be given consideration and some weight in establishing reasonable or fair value of a utility's property for rate-making purposes."

Going concern value is a proper element to be considered in determining a rate base if the constituting elements are present and the expense has not been recouped. The Company contends for a going concern value of $21,000,000 for business development costs. There was a time when an allowance of 10% on the physical plant was not challenged as a reasonable allowance for this item. The conditions which justified the allowance, as a matter of course, no longer exist. Years ago the cost of acquiring customers and developing business presented a serious problem for public utilities. The consumer was not informed as to the advantages of gas as a fuel compared to coal, he was not informed as to the advantage of electric lights compared to a Coleman lamp, and he was not informed as to the advantage of a telephone call, as compared to a communication transferred by the then means of transportation. No doubt a utility, under those conditions, incurred considerable cost in educating the public, soliciting customers, and idle plant following construction. Under present conditions, a new home is not built, nor a new area developed, unless the owner knows that electricity, gas, and telephone service are available. The utility need not solicit customers. The public is clamoring for service. The utility needs only connect.

If a public utility establishes, by appropriate evidence, that it has suffered loss by reason of cost or lag in developing business, and the loss has not been included elsewhere in the valuation or recouped from prior earnings, it is a matter to be considered by the Commission. A careful review of the record discloses no evidence justifying an allowance for going concern value in this case, nor any reason for it being made an issue in the finding of the reviewing court. This rule appears to be in harmony with that stated in the more recent decisions.

"It is the recognized rule in this State that an allowance may be made for value as a going concern in determining the rate base, if there is sufficient evidence to determine its amount, and if it has not been included elsewhere in the valuation of the property, and if it has not been recouped from the prior earnings of the business." (*Public Service Coordinated Transport v. State*, 5 N. J. 196, 220, 74 A 2d 580.)

"The Company complains of the refusal of the Commission to allow its claim for 'going concern value.' This claim was presented for consideration at the hearing. It was not allowed and is not discussed in the report.

"By 'going value' or 'going concern value' is meant a value or asset which arises from having an established or going business.

"In rate-making cases, the paramount question is whether the rates fixed will result in the confiscation of the public utility's property, and whether going concern value should be regarded as a distinct element of value in fixing rates depends upon circumstances. In our opinion this is not a case where going value should be allowed. (*Southern Bell Tel., Etc., Co. v. Louisiana Pub. Serv. Com'n.,* 187 La. 137, 183, 174 So. 180.)

"The testimony of the company's engineers was based wholly on theoretical lag and was therefore insufficient to support its claim: *Scranton-Spring Brook W. S. Co. v. P. S. C.,* supra. (119 Pa. Super. at page 139, 181 A. 77.) A claim on this account, when allowed, must be supported by evidence of actual lag, not necessarily from the books of the company: *Cheltenham & Abington S. Co. v. P. S. C.,* supra. (122 Pa. Super. at page 266, 186 A. 149.) The experts, in place of considering the history of the respondent, relied upon the fact that in many rate cases an allowance of ten per cent of present value was made. They failed to show that they had taken into account or considered the extent to which incoming revenues kept pace with investment. It was not shown that either the original installation or any extensions were made in advance of the demand for service, while there was some evidence that the public were asking for service in advance of the time at which it was supplied. The result is that the testimony is placed upon a purely theoretical basis and does not disclose either a sufficient history to determine whether any allowance should be made or that the experts considered such actual facts and took them into consideration in stating their conclusions." (*Solar Electric Co., Appel. v. P. U. C.,* 9 A. 2d 447, 137 Pa. Superior Ct. 325, 362, 363.)

An interesting, but in this case immaterial, controversy is presented as to the inclusion in the rate base the cost of a plant purchased by the Company where the purchase price exceeded the original cost of the plant less depreciation.

During the test period, the Company acquired certain telephone exchange property. The purchase price exceeded the original cost less depreciation by $61,000. The Commission disallowed the amount in its calculation of the rate base. The $61,000 would appear to be a proper allowance as found by the district court.

Where the reasonableness of the purchase price is not questioned by the Commission, it should be included in the rate base as the original cost of the Company's property. It should be understood, however, that where there is a material difference between the cost to the seller and the purchase price paid, the Commission may consider the prudence of the purchase and govern its allowance accordingly. This is particularly true where there are indications of an affili-

ated relationship. The principle involved may be material but the amount involved here, when compared with the total valuation, is not and the dispute will be given no consideration in calculations as to reasonableness of the Commission's order.

The determination of what constitutes fair and reasonable earnings requires a determination of the revenues and expenses the Company can expect to experience in the future. In this case the parties adopted a twelve months test period ending June 30, 1959. Issues are presented as to whether certain expense items presented by the Company should be recognized for rate-making purposes and whether others should be adjusted.

The allowance for expenses must be determined and deducted from gross earnings for the purpose of determining the amount available as a return to the investors. The Company made certain adjustments in its recorded operations and arrived at a net operating income of $8,674,543. The Commission made certain adjustments in the Company's recorded operations and arrived at a net operating income of $8,966,057.

The Company contends that it should be allowed operating expense not reflected by its recorded operations, and that the adjustments made by the Commission were improper. These disputed expense items will next be considered.

Current depreciation cost is one of the larger items of expense involved in this controversy. It approximates $8,000,000. The rates of depreciation to be applied to the properties are not in dispute. They are in conformity with the Uniform System of Account established by the Federal Communications Commission and adopted by the Commission.

The controversy arises over whether the rate of depreciation should be applied to the original cost of the properties, as was done by the Commission, or whether it should be applied to the present value of the properties as contended for by the Company. The court below found that, "the Commission's failure to consider current cost depreciation was erroneous."

The calculation of cost depreciation on the original cost of the properties rather than on the present value makes a difference of approximately $2,000,000. The amount allowed by the Commission is a deductible expense. The additional $2,000,000 contended for by the Company is not a deductible item. If this amount is allowed,

an additional amount of approximately $2,300,000 must be allowed for state and federal income tax.

Depreciation expense is defined in the Uniform System of Accounts as follows:

"Depreciation, as applied to depreciable telephone plant, means loss in service value not restored by current maintenance incurred in connection with the consumption or prospective retirement of telephone plant in the course of service from causes which are known to be in current operation, against which the Company is not protected by insurance, and the effect of which can be forecast with a reasonable approach to accuracy. Among the causes to be given consideration are wear and tear, decay, action of the elements, inadequacy, obsolescence, change in the art, changes in demand and requirements of public authorities."

The Commission contends that the purpose of depreciation allowance is to return to the investors the cost of the plant or the dollars invested. It is not intended to provide a surplus for replacing the original assets upon their retirement. The Commission next contends that the purpose is accomplished when the agreed rates of depreciation are applied to the original cost.

The Company meets the issue squarely by stating in its brief:

"Let the Company's position be entirely clear: the Company seeks only to recover through depreciation the value of the plant consumed in furnishing its service today in order that the integrity of the plant, *i. e.*, its value, is preserved. It cannot do so by basing its depreciation expense on plant investment made at pre-inflation price levels."

Again the Company relies on the Commissioner's report appended to the opinion in the case of *State, ex rel., v. Telephone Co.,* supra, where it was stated:

". . . If the law is that a return should be figured upon the value of the property rather than upon the original investment in the property, it must be that the depreciation charge should be similarly figured." (p. 292.)

The statement is of no value in the determination of this controversy because the present law does not require that the return be figured upon the present fair value of the utility's property. It is also doubtful if depreciation and the rate base, to which the rate of return is to be applied, are necessarily as closely related as the statement quoted indicates.

It would serve no useful purpose to review the limited number of decisions from other states and their divergent views on the question. The purpose of annual depreciation is to return to the investors the amount of their investment in the original plant. It

is not intended to return to the investors the cost of reproducing a new plant when the old plant has deteriorated. If the construction of a new plant requires additional capital, a fair rate of return will be allowed on such additional cost.

In *State ex rel. Utilities Commission v. State et al.*, 239 N. C. 333, 80 S. E. 2d 133, it was stated:

"For rate-making purposes a public utility is allowed to deduct annually as an operating expense so much of its capital investment as is actually consumed during the current year in rendering the service required of it. But the cost represents the amount of the investment, and it is the actual cost, not theretofore recouped by depreciation deductions, that must constitute the base for this allowance.

"Broadly speaking, depreciation is the loss *not restored by current mainte-nance* which is due to all the factors causing the ultimate retirement of the property. 'While property remains in the plant, the estimated depreciation rate is applied to the book cost and the resulting amounts are charged currently as expenses of operation.' *Lindheimer v. Illinois Bell Telph. Co.*, 292 U. S. 151, (54 S. Ct. 658, 665), 78 L. Ed. 1182; *Water Co. v. Alexandria*, 163 Va. 512, 177 S. E. 454; *Federal Power Com. v. Hope Nat. Gas Co.*, 320 U. S. 591, 64 S. Ct. 281, 88 L. Ed. 333.

" 'An annual depreciation allowance cannot logically or consistently be based upon fair value and reproduction cost, but rather the basis for computation should be upon the book cost of depreciable and depletable property.' *Equitable Gas Co. v. Public Utility Com'n.*, 160 Pa. Super. 458, 51 A. 2d 497, 504; *Utah Power & Light Co. v. Public Service Commission*, 107 Utah 155, 152 P. 2d 542; *City of Pittsburgh v. Public Util. Com'n.*, 171 Pa. Super. 187, 90 A. 2d 607.

"The whole purpose of the allowance is to maintain the integrity of the investment—to prevent a loss, not to assure a profit." (pp. 346, 347.)

There is no error in the Commission's allowance for depreciation. The district court erroneously concluded that depreciation must be calculated on the present fair value of the property.

State and federal income tax is the most important item of expense to be considered in the determination of a fair return. This exceeds all classified expenses other than maintenance. Income tax expense amounts to approximately 52% of the company's net income. For every $1,000,000 the Company is allowed to earn as a fair return an additional $1,150,000, plus, must be allowed for income tax expense. Income tax is charged as an expense in calculating the rate to the subscriber, and is not considered as equity capital or stockholders' expense for the purpose of public utility regulation.

The Company estimated its state and federal income tax at $8,314,600. The Commission disallowed $298,431 of this amount.

The Bell System files a consolidated tax return with the Internal Revenue Service. Included within that consolidated return are the majority of the Bell operating companies, including the Company in question. This Company pays its taxes arising out of the consolidated return directly to the Internal Revenue Service. The appropriate share of tax liability is computed on the basis of the Company's net income. Likewise, the Kansas share is computed on net income derived from operations in Kansas.

The Company contends that the tax liability should be computed upon the basis of the actual debt ratio of the Company, which is approximately 80 per cent equity and 20 per cent debt. The Commission contends that since the Company is a wholly owned subsidiary of A. T. & T., the tax liability of the Company should be based upon the actual debt ratio of the parent and the subsidiary, which is approximately 66 per cent equity and 34 per cent debt. The difference between the positions taken by the Company and that of the Commission with respect to federal income taxes is approximately $298,431.

Both the district court and our commissioner found the Commission to be in error in disallowing the $298,431 as federal income tax chargeable to the Company. They stated as their reason that there is no logical basis for disregarding the separate corporate entities for the single purpose of calculating income tax.

We do not believe the reason given is sound. We have no intention of suggesting that the separate corporate entities of A. T. & T. and its subsidiary companies be disregarded. However, when the parent company and its subsidiaries elect to file a joint income tax return, they have disregarded their separate entities for income tax purposes. At least they have for tax purposes combined their income and expense. It is evident also that the parent company has used long term indebtedness, on which the interest is deductible from income as expense, with which to buy the common stock of its subsidiaries whose income tax is paid by its consumers as a chargeable expense. The Commission stated:

"The Applicant's chief accounting officer, witness Griesedieck, testified that the state and federal income taxes set forth in the exhibits were computed following the same method as that used in computing the Applicant's actual income tax liability. On cross examination he conceded that the Applicant does not file a separate income tax return but, rather, files a consolidated income tax return with A. T. & T. He further testified that the interest which was paid by each operating company to 'those outside of the consolidation

was included in the consolidated return as a deduction.' In his computations for the determination of the amount of income tax allocable to the Applicant, he included interest expense which was paid by the Applicant to its parent or other members participating in the filing of this consoldated income tax return. Yet in filing this consolidated tax return he eliminated such interest. In fact, he testified as follows:

" 'I go back to my original statement, Mr. Rice. In a consolidated return you *will have to eliminate interest payments between parties within the consolidation.*' (Emphasis supplied.) His computation includes as a deduction interest *which was not* deducted in computing federal income taxes (interest payments to the parties within the consolidation), and neglects *to include* interest which was utilized as a deduction for federal income taxes (interest on *system-wide* debt).

"The Staff proposed an adjustment of federal income taxes of $298,431. Witness Leroy, formerly a revenue agent with the Internal Revenue Service, proposed to correct witness Griesedieck's computation by accepting only those things which witness Griesedieck concedes must be done in the tax returns as they were filed and the taxes were actually paid by A. T. & T. He began with the total capital employed in the State of Kansas, as reflected in Whiteaker's *Exhibit No. 2.* He thereupon applied the system-wide debt ratio of 34.29 percent to this total capital and determined that the amount of system-wide debt which was allocable to the property in Kansas was $62,389,859, and computed the debt cost allocable to the State of Kansas of $2,133,733. This interest cost was substituted for the interest cost used by the Applicant in its compuations of income tax liability. Using this method he ascertains that the actual income tax expense incurred by the Aplicant was $298,431 less than the amount presented by the Applicant in its testimony.

"The Applicant's federal income tax liability was incurred and assessed on a basis of a consolidated income tax return filed by A. T. & T. and its operating subsidiaries. The Applicant introduced copies of checks which indicated that it paid funds direct to the Director of Internal Revenue. This method of payment does not affect the ultimate liability of the Applicant, nor does it constitute evidence of the amount of taxes which were in fact incurred. Apparently the Applicant paid a portion of income taxes which should have, in fact, been paid by its parent, A. T. & T. In the final analysis the tax liability was incurred and the taxes paid on the basis of the consolidated return. In such return the interest expense which was deducted from gross income was not the interest expense which witness Griesedieck testified he used in his computations, but rather, the consolidated interest costs of the groups paid to persons or entities outside the consolidated group."

The parent company has seen fit to take advantage of a consolidated income tax return by combining its income and expense with that of its numerous subsidiaries. We cannot say as a matter of law that the Commission abused its discretion in calculating the Company's income tax liability on the actual debt ratio of the parent and its subsidiaries which is approximately 66 percent equity and 34 percent debt.

Another expense item, which is immaterial in this case but appears to be a matter of principle worthy of considerable space in the briefs, is that of the Chamber of Commerce dues and charitable donations. In its brief, the Commission states its position as follows:

"The Company, in its income statement, included the sum of $18,337, which constituted Chamber of Commerce dues and charitable contributions. The Commission granted to the Company the benefit of 52 per cent income tax deduction resulting in a net adjustment of approximately $9,000. The Commission ascertained that these amounts were donations and not a business expenditure which should be borne by the telephone subscribers. Accordingly, charitable contributions were found to be donations to be absorbed by the stockholders."

The district court found that the items should be allowed as expense. There is no contention that the amounts are unreasonable or excessive.

It is concluded that such expenditures are necessary if a company, firm or individual is to maintain its standing and good will in a community. Such expenditures should be allowed as a legitimate expense in any business. They are, however, subject to strict scrutiny by the Commission as to their reasonableness and propriety. Decisions may be found supporting both sides of the argument. Their review would serve no purpose here. It has not been the policy of this state to penalize any individual or corporation for assuming reasonable charitable and civic responsibilities.

It was estimated that the expense of the Company in preparing and presenting this rate case before the Commission would cost approximately $558,950. The Commission amortized this amount over a five-year period for the purpose of normalizing future expense. Included in the estimated expense is the sum of $119,886 which the Company claims represents the wages and salaries of regular employees who assisted the engineer in making his valuation study. It contends that the expense will be a continuing one and should be allowed as an expense. The Commission contends in its brief:

"These employees were also engineers with the Company and work on many other projects. If their work is performed on a capital asset, such as building or other telephone plant, the wages and salaries of such personnel are capitalized. These sums are then returned in the form of depreciation expense over the life of the building or plant on which the work is performed. If the work performed is on a building having a forty-year life, then such wages and salaries are recouped at the rate of 2½% a year and not for 100 per cent. The Commission was of the opinion that such employees, whose entire wages and salary which are not necessarily placed in operating expenses,

should be amortized over the same five-year period in accordance with the other expenses directly attributable to this proceeding."

The Company responds:

". . . The Commission would place the burden on the Company of proving how much of these employees' time would be allocated between capital projects and work charged to expense accounts.

"It would seem that the Commission should be required to sustain its disallowance by adequate findings supported by evidence and that the Commission's disallowance was erroneous because of its failure to do so."

The Commission should not have the burden of disproving a requested allowance not substantiated by evidence on the part of the Company. The controversy will be disregarded because there is no evidence to support a determination.

We will state that the Company's position is correct if it can present facts to support its contention that part of the expense included wages and salaries of regular employees.

During the test period the Company's casualty expense was very low. There was no dispute over the necessity of adjusting it upward in anticipation of a heavier casualty loss in the future. The first dispute is over the period of study used in making a normalized adjustment. The district court properly analyzed this phase of the dispute and reached a proper conclusion as follows:

"The Company contends that the normalized casualty expense adopted by the Commission is too low because the Commission used an unreasonably long and, therefore, nonrepresentative study period and, in addition, failed to consider current wage and price levels in its calculation.

"The Company arrived at its normalized figure by averaging the actual casualty expense over the most recent five-year period. This is the method which the Commission had used in recent cases.

"The Commission adopted the recommendations of its Staff which were based upon an entirely different approach. Casualty expenses associated with the 1951 flood on the Kansas River were treated separately and were averaged over a 48-year period to produce an allowance for 'major catastrophe.' Other casualty expenses were based on the Company's experience during the 20-year period from 1939 to 1958. The Commission undertook to estimate and allow for the increased amounts of plant exposed to casualties, but made no attempt to adjust for changes in wage and price levels which occurred during the 48-year and the 20-year study periods.

"This is a normalizing adjustment and in such adjustments the Commission's view should not be disturbed unless it is clearly unreasonable. The question before us is simply whether the Commission's adjustment is reasonable in view of the record.

"While the normalizing periods used by the Commission are unusually long and apparently unprecedented, we are unable to say that the use of these periods is unreasonable as a matter of law."

The second dispute over this question is whether the normal expected casualty repair expense should be correlated with the original cost of the property damaged or with the current cost of repairing such damaged plant. The Commission correlated the expense with original cost. The district court ruled that the casualty expense must be correlated with current costs of repairing such expense.

This again is a dispute on principle rather than on an amount affecting the merits of the case. There are no facts in the record from which an exact calculation can be made as to the difference in dollars had the Commission correlated casualty expense with the current cost of repairing such expense. The Commission allowed $109,198 for casualty expense. A percentage of allowance may be determined by dividing this amount by $144,148,582, which the Commission found to be the depreciated original cost of the plant. If this percentage is applied to the present fair value of the plant, as adjusted from Patterson's calculation ($175,000,000 less materials and supplies) the difference would be less than one-fiftieth of one percent.

The commissioner concluded that the Commission was correct in correlating casualty repair expense with original cost. We cannot agree. Our commissioner attempted to state the rule applicable to casualty replacement cost but he did not carry through by stating and applying the rule applicable to casualty repair expense. We agree with the Company's contention on this issue.

When a casualty occurs, some of the damaged plant has to be replaced and some repaired. The original cost of the plant that has to be replaced is removed from the property account and charged to the depreciation reserve. The present cost of the new plant is put in the property account and included in the rate base. The casualty repair expense is for repairing the portion of the plant that did not have to be replaced. This question involves the determination of the labor expense, traveling expense, cost of minor items of material, etc., which may be expected to be incurred in a year for repair of damage done by casualties. This work will be performed at today's labor rates and material costs. Current price and wage levels must be recognized.

The calculation of a fair rate of return presents the most elusive and difficult question in this case. There does not appear to be much dispute as to what factors are to be considered in determining

a fair rate of return. The Company contends for three standards and lists them as follows:

(1) A public utility is entitled to a return equal to that generally being made at the same time and in the same general part of the country on investments which are attended with corresponding risks and uncertainties.

(2) The return must be sufficient to enable the utility to maintain its financial integrity.

(3) The return must be sufficient to enable the utility to attract new capital on reasonable terms.

These standards are generally recognized by regulatory authorities and the courts.

The Company approves the statement made in the Commission's brief:

". . . A fair rate of return is that which will provide a company sufficient revenues to maintain its credit, and to attract capital at a rate of return commensurate with other investments and enterprises having corresponding risks and to preserve the financial integrity of the utility."

The Company contends that the Commission used only the capital attraction test, and completely ignored the financial integrity test and the comparable earnings test.

It would appear that if a utility is allowed a rate of return which will attract capital on reasonable terms, its financial integrity is fairly well assured. At least the two standards are closely related. The same facts and principles that establish one will tend to establish the other.

The district court found that the Commission erred as a matter of law in that: "In determining the rate of return the Commission rejected all of the evidence in the record with respect to the earnings of non-Bell System business having comparable investment risks."

This finding is contrary to the Commission's finding that the "non-Bell System businesses whose earnings were presented for comparison did not have comparable investment risks."

The Commission devoted considerable space in its opinion to this question. It stated that the witness who presented the comparative earnings study, ". . . admitted that his group of sixty companies are not necessarily similar to each other." In its opinion the Commission stated:

"In the data presented by witness Johnson to support his conclusion that the Applicant should be entitled to a rate of return of 9 per cent to 10 per cent on a net investment rate base, or 7 per cent on fair value, he selected three

groups of companies. In all of the groups selected he did not select companies which were similar to each other in the group. It requires no mathematical or statistical insight that where a person does not have a homogeneous group the average cannot reflect a typical characteristic of that group. Statisticians have developed measures or tests which indicate the extent to which an average is significant. However, witness Johnson has not attempted to make such tests. The lack of any central tendency and complete disparity among the companies in a group clearly indicate that such groups are not homogeneous. They are not similar to each other and not being similar cannot possibly be similar to the Applicant.

"For example, the first group of fifty companies selected by witness Johnson show that in twelve out of thirty-four years at least one of the fifty companies had losses, and that these loss situations were not limited to the early 1930's. In fact, in this group the earnings in a given year may vary from 23.7 per cent for one company to a *loss* of 43 per cent for another. This is not the case for utilities such as the Applicant, and witness Johnson so admitted. In fact, there were sharp differences in the rates and patterns of earnings for two companies in the same field. Thus, in 1933, when General Electric earned 3.9 per cent on its capital, Westinghouse lost 5 per cent. In 1956 General Electric earned 15.5 per cent but Westinghouse earned only 1.3 per cent. The lack of similarity in these fifty companies is obvious.

"In witness Johnson's second group of sixty companies he admitted that these companies are 'not necessarily' similar to each other, as reflecting the same or nearly the same risks. The range of earnings of these sixty companies in a given year is as wide as twenty-to-one. He did not believe that even an average which he derived for a given company for the period he selected, is indicative of the prospective level earnings of that company. Therefore, such an average clearly does not indicate what the prospective earnings of the Applicant should be.

"Witness Johnson's data clearly indicates that these sixty companies are not only dissimilar to each other but are not comparable companies to the Applicant."

The court should not substitute its judgment for that of the Commission where the matter is in the realm of fair debate.

In considering a return which would be sufficient to enable the Company to maintain its financial integrity and attract new capital on reasonable terms, the Commission gave considerable attention to the cost of debt capital and the cost of equity capital.

The Commission accepted the composite contractural cost of debt of the Company and its parent. The Company has outstanding some $275,000,000 of debt. The contractural cost of this debt is 3.59 per cent. The imbedded cost of the debt of A. T. & T. as of December, 1958, was 3.43 per cent, the composite cost of debt is 3.49 per cent.

Witness Johnson, on behalf of the Company, suggested that the

Commission disregard the contractural cost of debt and use in lieu thereof the current cost of acquiring debt capital. However, witness Langum, also testifying on behalf of the Company, preferred to use the imbedded cost of the existing debt of both the Company and its parent and then ascertain the full incremental cost of additional debt. Accordingly, the Commission used the composite contractural cost of debt, which is ascertained to be 3.49 per cent.

On this phase of determining the cost of debt capital there is no serious issue presented.

The Company contends that the cost of debt capital for new construction, since the test period, is and will continue to be higher than that found by the Commission. If that is so, it is a matter that will require attention after the new construction is placed in operation. Reduction in expense or increased income may absorb the additional cost. The cost of the long term indebtedness covering the property in service at the time of the hearing is not in dispute.

Considerable evidence was introduced before the Commission as to the cost of equity capital. The Commission had before it the earnings on equity capital of five Bell operating companies which provided telephone service over the United States, each of which had stock which was on the open market. Their stock was traded and purchased by independent investors. The Commission considered these five companies to have corresponding and similar risks as this company whose stock was owned entirely by its parent A. T. & T. The evidence disclosed that these five companies had an average earning on their common stock, for the five years preceding the test period, of 8.16 per cent. The Commission considered this evidence in connection with the other evidence submitted and concluded that the equity capital should have a return of from 8.4 to 8.6 per cent. It used a figure of 8.55 per cent as a reasonable return on equity capital, *i. e.*, the return necessary to enable the utility to maintain its financial integrity and attract equity capital. The Commission then consolidated its studies and arrived at an overall rate of 6.59 per cent.

The Commission found the rate base, the rate of return, and the present net operating income and concluded:

"The Applicant, after taking into consideration the foregoing normalizing adjustments, had a net operating income of $8,966,057. This allowance of 6.59 per cent on a rate base of $145,399,082, increases the Applicant's present income to $9,581,799."

After the Commission had reached its conclusions, it proceeded to prove that it had allowed a fair rate of return by a calculation showing that the net income to be produced met all of the revenue requirements of the Company. The Commission stated:

"The total capital employed in Kansas intrastate operations amounted to $143,920,617, of which $119,130,147 was supplied by the parent A. T. & T. by advances and investment in the common equity of Southwestern Bell Telephone Company. The remaining funds in the amount of $24,790,470 employed in Kansas intrastate operations were secured by the issuance of debentures of the Company. The parent company capitalization at December 31, 1959, indicated a debt ratio of 20.233 per cent and an equity ratio of 79.767 per cent. The funds invested in or advanced to the Applicant by the parent, A. T. & T., are represented by $24,103,602 of debt outstanding in the hands of the public and $95,026,545 representing equity capital.

"The Kansas intrastate portion of the total capitalization of the Applicant after consideration of the actual investment policies of the parent A. T. & T. and of Southwestern Bell Telephone Company is as follows:

|  | Amount | Ratio | Int. rate | Interest |
|---|---|---|---|---|
| Equity capital .......... | $95,026,545 | 66.027% |  |  |
| Debt capital: |  |  |  |  |
|    Southwestern Bell ... | 24,790,470 |  | 3.592% | $815,859 |
|    A. T. &. T. .. ..... | 24,103,602 |  | 3.3848% | 815,859 |
| Total debt ............ | $48,894,072 | 33.973% | 3.49% | $1,706,382 |
| Total capitalization .... | $143,920,617 | 100% |  |  |

"This capitalization is computed upon the basis ascertaining the actual amount of debt capital furnished by A. T. & T. The interest, expense and other income and charges, when related to the net operating income, provides $8,126,663 net income available for the stockholder of the Applicant, A. T. & T. The rate of return on this equity capital is approximately 8.55 percent.

"In the determination of revenue requirements as a result of this increase, we have taken into consideration the actual capitalization of the parent company and the cost of the debt capital of the parent. When this factor was taken into consideration, together with the capital structure of the Applicant and A. T. & T., we discerned that the use of this method is to the advantage of the Applicant and compares favorably with the cost of debt and capital structure presented in this proceeding. We used a 3.49 percent cost of debt as compared with the Bell System debt cost of 3.42 percent. We also used a debt ratio of 33.97 percent instead of 34.29 percent. Both of these computations inure to the benefit of the Applicant. Since these figures represent the actual composite debt cost and capital structure of the parent, A. T. & T., and the Applicant, we conclude the use of such a method is logical and consistent with sound utility regulation, especially where the operating company is a wholly owned subsidiary of a national utility."

This demonstrative calculation has caused more confusing controversy than any other issue in the case.

The Company contended that the calculation was erroneous and conflicted with the rate of return allowed. It also contends that the Commission erred in including interest on plant under construction as other income in its calculation.

The district court sustained the contentions of the Company. The Commission objects to the conclusion of the district court.

Our commissioner stated—"The unimportant issue (unimportant if the rate of return allowed by the Commission was reasonable) will probably be confused further by any attempt to explain it." He then concluded that the Commission's method of calculation was proper and would have obtained the correct result, but that the Commission was in error in using interest on plant under construction in its calculation as other income.

Both the Commission and the Company have taken issue with our commissioner's conclusions.

We agree with our commissioner that his attempt to explain the issue has not lessened the confusion. Space does not permit a lengthy explanation in sufficient detail to eliminate all doubtful inferences. It must be understood, to avoid confusion, that for the purpose of the Commission's calculation the rate base was given no consideration. The Commission was considering only the actual investment in the plant.

We do not believe that the Commission erroneously included interest on plant under construction, as other income, in its calculation. The Commission did not include plant under construction in the rate base. Neither was interest on plant under construction included in income which was to be derived from the application of the 6.59% rate of return. The Commission was simply demonstrating that the net income it had allowed was ample to meet the revenue requirements of the capital invested.

Insofar as the Commission's theoretical calculation is concerned, it was dealing with the actual capital allocated to Kansas. This included capital covering work in progress. If such capital is included then interest on such capital must be included as other income or the calculation is thrown out of balance. The Company carries interest during construction on its books as income until the construction is transferred to the plant account. The interest carried as income is then transferred to the plant account as cost of construction.

This is an area in which the Commission, with its experienced

engineers and accountants, is better equipped to cope than are the courts.

The Company contends that the Commission has attempted to substitute its judgment for that of the Company as to the capital structure. In its opinion the Commission stated:

"Admittedly the Applicant intends to continue its construction program in this state. In order to bring the Applicant's capital structure in line with what we have previously found to be prudent, the Applicant may finance up to $50,000,000 of new improvements by debt financing. If the Applicant follows such a financing program over a period of years then its earnings available to the equity holders will increase in approximately direct relation to the corresponding increase of debt financing in the capital structure. Such a program would result in a rate of return to the equity holder in excess of that which we found to be a fair and reasonable rate."

The district court found: "While the Commission has stated that the factor of capital structure had not entered into its conclusions with respect to rate of return, it is clear that this factor has influenced the Commission."

It is difficult to determine all of the considerations which passed through the minds of the Commissioners in reaching a conclusion in this complicated case.

The Commission says the matter did not enter into its conclusion with respect to a fair rate of return. There is nothing in the record to indicate that it did. There would appear to be much authority for the Commission's suggestions.

In *New England Telephone & Telegraph Co. v. Department of Public Utilities,* 331 Mass. 604, 121 N. E. 2d 896, the Supreme Court of Massachusetts stated as follows:

"As a matter of internal management, the Company's directors had the right to determine upon the reduction in indebtedness. Indeed, the department's very decision declares that the primary duty of the directors was to exercise their own best judgment of what was best for the company, and intimates by indirection that they did so. The directors did not have to abdicate their own business judgment and to ingest the department's opinion or else be denounced as contumacious. But . . . debt structure and percentages of debt and equity capital enter vitally into the determination of the amount which the consuming public should pay. A 35 per cent debt ratio might be deemed in the nature of a company luxury not to be reflected in rates to be charged the public. In any event, the department could think so without our being able to adjudge that there is anything unlawful or confiscatory about its position."

To the same effect is *Southern Bell Tel. & T. Co. v. Louisiana Pub.*

*Serv. Com'n.,* 239 La. 175, 118 So. 2d 372, where the court stated as follows:

"The Company argues that the Commission has invaded the reasonable range of discretion of the Company's board of directors when it in effect attempts to determine the amount of debt which the utility must incur. This same argument was made when this case was before us in Southern Bell Telephone & Telegraph Co. v. Lousiana Public Service Commission, *supra* . . ., where we rejected the Company's contention.

. . . . . . . . . . . . .

"In addition to the approval of the formula by us it has been held valid by the courts in the states of Massachusetts, New Hampshire, Vermont, Maryland, Mississippi, New Mexico, Idaho and Pennsylvania. It has likewise been adopted by the Commissions in the states of Tennessee, Connecticut, South Dakota, Utah, Texas, Nebraska, Illinois, Alabama and in the District of Columbia."

It matters not whether the rate of return is to be applied to a cost of construction rate base or a present fair value rate base, the capital structure is important in determining the cost of capital.

We would add that where a parent holding company maintains a high debt ratio in its capital structure while its operating subsidiary's debt is practically nil, a question might well arise in the minds of the members of a regulatory body as to reason and the effect.

The next contention made by the Company presents a more serious problem. The Commission, although making no finding of any impropriety, stated that it would take the transaction between the Company and its affiliates into consideration in the determination of a fair rate of return. This matter was covered by the district court as follows:

"First, the Company contends that the Commission's rate of return finding must be set aside because the Commission considered four 'unrelated' subjects in arriving at the allowed rate of return. At page 97 of its Order, the Commission said that in determining a fair rate of return it was considering the benefits accruing to the Company because of the existence of the license contract between the Company and A. T. & T., the earnings of Western Electric Company, and the procedure which was followed in separating the Company's property and expense between interstate and intrastate operations. What the Commission really means by this is that it is considering benefits which it believes the parent holding company receives at the expense of Southwestern Bell and therefore at the expense of the rate payer. At page 61 of its Order, it said it was also considering the 'factor' of the Company's payments into its employees' pension trust fund in determining a fair rate of return. In other sections of its Order the Commission was critical of the Company on these

four subjects, but it made no specific disallowance in either rate base or expenses because of any one of them.

"Earlier in this report I stated that there is no finding by the Commission which would support a disallowance on any of these subjects, and therefore the Commission was incorrect in 'considering' these factors in the rate of return. The Commission was performing its duty in scrutinizing the relationships between the Company and its affiliates, A. T. & T. and Western Electric, to see if there was any unfairness or unconscionable gain, but, as the Ohio Supreme Court said, in *City of Columbus v. Public Utility Commission of Ohio*, 93 N. E. 2d 693 (1950), '. . . the mere existence of such relationship cannot stand as proof of such facts. If there is such unfairness or exploitation it must be shown by evidence in the record.' "

The fact that transactions take place between affiliated Companies is a matter justifying close scrutiny, but the matter should not be given any consideration in the absence of evidence of unfair dealing.

In *Southwestern Bell Tel. Co. v. State Corporation Comm.*, 169 Kan. 457, 219 P. 2d 361, this court considered the proof necessary to establish the reasonableness of affiliated company transactions. Once the Company had established such proof, the Commission must abide by the results unless it wishes to introduce evidence to the contrary.

Adjustments in rate cases cannot be made on speculation and conjecture. This court has approved the statement that "a court or commission is not allowed to roam the unfenced fields of speculation." (*St. Louis-San Francisco Rly. Co. v. State Corporation Comm.*, 187 Kan. 23, 353 P. 2d 505.) The extent to which the Commission reduced its idea of a fair rate of return because of the factors mentioned, if any, is not disclosed. It would appear from the method by which the Commission arrived at the rate of return that it was not actually given any consideration. The order of the Commission will not be set aside unless the return allowed is found unreasonable.

What has been said is not to be understood to mean that the Commission cannot consider existing affiliated relationships in determining ability to attract capital, cost of capital, corresponding risks and other factors which tend to reflect on a fair rate of return.

The Company complains that the Commission did not give sufficient consideration to attrition and the anticipated effect of future inflation. The district court so held. The Commission contends:

"In a period of rapid expansion combined with some degree of inflation, the utility's average investment per customer, and hence the amount of capital which must be serviced by each customer, tends to rise faster than do the

revenues. Its rates are geared to the average unit cost of plant in an earlier time; hence the growth in sales does not provide sufficient additional revenue to service the additional higher cost plant. This condition is commonly referred to as 'slippage' or 'attrition.'

"The Applicant's witnesses testified that it was subjected to the forces of attrition, namely, increasing material cost, higher labor cost, and was required to provide more elaborate and expensive equipment at higher cost to replace the equipment retired. The Staff presented testimony to the effect that during the last year, the Applicant's revenues have increased and that the amount of expenses attributable to each telephone unit in service has decreased, and that the revenues for 1959 are also on the increase. In 1953 the sum had decreased to $17.04. The number of employees per thousand telephones was reduced from fourteen to nine since 1952. During the period from 1953 to 1958 the average cost of wages per unit of service decreased from $39.29 to $35.52. Since 1952 it is admitted that revenues have increased during each year. From 1953 to 1958 the revenues per unit of service increased from $77.53 to $88.52. The Applicant has produced no evidence concerning whether these offsetting factors are less than sufficient to eliminate the effects of attrition. From this testimony it is clear that the important question for this Commission to determine is whether the increase in revenue has been sufficient to counteract the forces of attrition and absorb the effect of these erosive factors. In viewing the record, it appears that the offsetting forces are more than sufficient to absorb the effect of attrition."

Again there is no justification for the court substituting its judgment for that of the Commission. Although rates are made for the future, the allowance of an increase in income in anticipation of further inflation can have a very unwholesome effect on economy.

What constitutes a just and reasonable return is not subject to exact definition. This court has stated that the words "just and reasonable" do not mean "nonconfiscatory." A rate may be nonconfiscatory, as the word is used in considering constitutional prohibitions, and still be unjust and unreasonable.

In *Railroad Co. v. Utilities Commission*, 95 Kan. 604, 148 Pac. 667, it is stated:

"There is, however, much merit to the contention of the carriers in the case at bar that the word 'unreasonable' is not synonymous with 'confiscatory'; and this is supported by noting that the judicial review of an order of the commission shall be determined according to equitable principles. A rate may not be confiscatory, that is, it may not be so low as to amount to a taking of the carrier's property, its transportation, without due process of law or without just compensation, and yet be inequitable in that it does not yield a fair compensation, which would include cost of moving the traffic, wear and tear of tracks and equipment and a fair profit for the service rendered . . ."

The term "just and reasonable" rates, as used in G. S. 1949, 66-110, means something more than "nonconfiscatory," but it is difficult to

determine when the rate of return allowed becomes unreasonable as a matter of law. This court has defined the term unreasonable.

In *Southern Kansas Stage Lines v. Public Service Comm.*, 135 Kan. 657, 662, 11 P. 2d 985, this Court stated as follows:

"It is not so easy to define what is meant by the term 'unreasonable' as used in this statute. The Act itself prescribes no standard by which to test the validity of an order of the commission assailed on the grounds that it is unreasonable. In *Railroad v. Utilities Commission*, 95 Kan. 604, 615-622, 148 Pac. 667, the court dealt at some length with the legislative use of the words 'unreasonable,' 'unjust,' 'oppressive,' and 'unlawful' in the Utilities Act, and held that they were not synonymous with the word 'confiscatory,' and that they should be given their fair and reasonable import according to the usages of courts of equity. In Soule's Dictionary of English Synonyms, 'unreasonable' is set down as conveying the same idea as 'irrational, foolish, unwise, absurd, silly, preposterous, senseless, stupid, injudicious, nonsensical, unphilosophical, ill-judged, exorbitant, extravagant, unfair, unjust, extortionate, excessive.'

. . . . . . . . . . . . .

"It is only when such determination is so wide of the mark as to be outside the realm of fair debate that the courts may nullify it. The same regard should be given to the informed conclusions of fact made by the public service commission. Where its findings of fact are based upon substantial evidence and other matters shown by the record with which that tribunal is authorized to deal, a court is not justified in setting its orders aside because the record shows that a different order or decision than the one made by the commission could fairly have been based thereon. Indeed, there are narrow limits to the authority which the legislature could confer on the court to deal with the sort of powers which may properly be vested in an official board like the commission."

The Commission found that under the circumstances in this case, a return of 6.59% was reasonable. There is a range of reasonableness. It cannot be assumed that the Commission in establishing a rate has fixed it to the exact degree of definiteness. At some point a rate of return becomes so low as to be unreasonable to the Company as a matter of law. At some point a rate of return becomes so high as to be unreasonable to the consumers as a matter of law. It is only at the high and low point that a court can interfere. It is the responsibility of the Commission to fix the rate somewhere between the high and low point which it believes, under all of the circumstances, to be fair to both the Company and the consumer.

A court cannot fix the rate of return. It can only determine when a rate is so low or so high as to exceed the bounds of reasonableness.

In *State, ex rel., v. Flannelly*, 96 Kan. 372, 152 Pac. 22, it is stated:

"The courts have repeatedly declared that the courts can not fix rates, and that fixing rates is a legislative function. When rates are fixed, the courts can

ascertain whether or not they are in violation of law or of some constitutional provision. But courts have not the authority to determine what rates will be reasonable, just, compensatory, or legal, and then put in effect those rates. The commission can not finally determine what rates will be legal and will not violate constitutional provisions. The commission is the body authorized by law to say in the first instance what rates are legal and will not violate constitutional provisions, but the courts must finally say whether or not the rates fixed are illegal or do violate such provisions. The one function is legislative, while the other is judicial. The commission can not invade the field occupied by the court; neither can the court invade the field occupied by the commission. The commission must act first, and the courts afterwards."

A complete record is before the court in this case. After a careful consideration of all the facts and circumstances presented for the Commission's consideration, and a review of the recent decisions touching on the matter it would appear that a rate of return of under 6.59%, on the rate base found by the Commission, would not be approaching the zone of unreasonableness rendering it unlawful.

The Company's stock is not sold to the public. It is all held by A. T. & T. In December of 1958, during part of the test period covered by this investigation, the Company issued $110,000,000 of stock to A. T. & T., at par value, to liquidate an indebtedness. The record discloses:

"The Bell System's capital structure during the period of 1947 to 1958 changed considerably. Surplus increased from $330,481,000 in 1947 to $1,933,327,000 in 1958, or an increase of almost 500 percent. The ratio of debt declined from 50.46 percent in 1958 to 31.93 percent in 1956. The present debt ratio of the Bell System is 34.29 percent as of December 31, 1958. The equity capital, which includes stock plus 10.97 percent surplus, was 67.71 percent at the end of the calendar year of 1958. Since 1947 the equity of the company has increased by 287 percent, only an increase of 119 percent in debt, while surplus has increased 485 percent.

"The dividend payout of the Bell System during the period from 1938 to 1958 was 77.4 percent. During this same period the dividend payout for the Southwestern Bell Telephone Company was 79.2 percent. For the period from 1949 to 1958 the dividend payout was 70.8 percent and 74.1 percent, respectively. The surplus of the Bell System is presently six times as large as it was at the end of 1938. During this twenty-year period the Bell System retained $1,682,646,000. Despite the fact that the number of shares of outstanding stock of the Bell System more than tripled during this period, the earned surplus per share increased from $16.52 at the end of 1938 to $27.41 at the end of 1958."

It does not appear that either the Company or A. T. & T. is having any difficulty attracting capital or paying dividends.

Summarizing the errors which we have found in the Commission's

findings and conclusions, we find: (1) $61,000 should be added to the rate base, the amount of the purchase price of an exchange over the cost of reproduction new less depreciation; (2) $9,000 should be added to expense as an allowance for dues and contributions; and (3) approximately $30,000 should be added as additional anticipated casualty repair expense.

We do not believe that an error of $61,000 on a rate base of $145,399,082, nor an error of $39,000 on a net operating income of $9,581,799 is of sufficient importance to justify setting aside the order of the Commission.

As has been previously stated, there is a range of reasonableness for a rate of return. If a Court is to upset an order of the Commission because it finds the rate of return to be a fraction lower than that found by the Commission, then it would have to upset the order if it found the rate to be a fraction higher. No two individuals could review these complicated proceedings and reach exactly the same answer.

This court cannot say, as a matter of law, that a return of a small fraction of one percent lower than that found by the Commission is so unreasonably low as to be unlawful.

This court cannot fix a rate. Neither can it tell the Commission what rate would be most fair to both the Company and the consumers. This is the sole responsibility of the Commission.

"In proceedings to compel compliance with an order of a public utility commission or to prevent its enforcement, the court should grant final judgment or decree either dismissing the proceedings or directing that process issue as prayed. The court may strike down the order if it is illegal, but it has no authority to ascertain or determine what order would be reasonable and proper, or to establish such an order. Where rates fixed by the commission are under attack, the court may determine the illegality thereof and restrain their enforcement, but may not fix new rates." (73 C. J. S. Public Utilities, Sec. 67, Page 1204.)

It necessarily results from what has been said that the injunction orders were improperly issued by the lower court. The original order provided:

"IT IS, THEREFORE, BY THE COURT CONSIDERED, ORDERED, ADJUDGED AND DECREED that the operation of the Commission's order dated May 27, 1960 and the supplemental order of June 29, 1960 entered in its Docket No. 60-800-U should be, and they are hereby stayed and enjoined as prayed for in Plaintiff's Application for Stay, and the Defendants are stayed and enjoined from interfering in any way with the Plaintiff in promulgating, charging, enforcing and collecting fair and reasonable rates, charges, schedules and

tariffs for intrastate telephone service in the State of Kansas during the pendency of these proceedings."

In its final judgment the lower court stated:

"The Order of this Court made and entered on September 15, 1960, temporarily staying and enjoining the operation and effect of said Orders of the Defendant Commission should be, and the same is hereby made permanent and continued in full force and effect until such time as the Defendant Commission shall establish fair and reasonable rates and charges for the Plaintiff in accordance with the Decision and Findings of Fact and Conclusions of Law herein set forth."

The rule applicable to stay orders or temporary injunctions in rate cases is stated in 73 C. J. S., Public Utilities, Sec. 67, at page 1204 as follows:

"In order to warrant an injunction pendente lite it must appear that there is a reasonable probability that complainant will prevail on final hearing; and, where the matter is doubtful or where it is probable that a practical test will be required to ascertain the reasonableness of the order or regulation in question, such relief should be refused. So, where there is any doubt as to the proper exercise of the commission's discretion in making its order, as where the record presents a bona fide controverted issue of fact, a temporary injunction should not be granted. Injunctive relief in such case should not be granted except after a plenary trial of the issues on the merits."

The lower court appears to have recognized the rule as quoted above. It concluded in its order granting a temporary injunction:

"The earnings allowed to the Plaintiff by the Defendant Commision are not sufficient to enable Plaintiff to earn a fair return . . . on the *present fair value of its property* and this denial of earnings to which the Plaintiff is lawfully entitled would result in great and irreparable damage to the Plaintiff if the stay herein petitioned were not granted in that Plaintiff would suffer daily confiscation of its property until reasonable and adequate rates are ultimately fixed." (Emphasis ours.)

The error of the District Court in granting the temporary injunction and later in making that injunction permanent grew out of its conclusion that the law of Kansas requires the use of a current fair value rate base; that is, that G. S. 1949, 66-128, places a mandatory requirement upon the commission to determine the *present fair value* of the company's property by using only estimated reproduction cost new less depreciation or some related formulae, and by excluding any consideration of original cost less depreciation. As we have seen, the term "reasonable value" as used in the statute has a connotation peculiar to rate proceedings and the commission is not bound to any particular formula or combination of formulae in determining the reasonable value of the company's property.

The judgment of the district court, in the case numbered 42,348, granting a stay and temporary injunction is reversed.

The judgment of the district court in the case numbered 42,472, vacating and setting aside the Commission's order, and making permanent its temporary stay and injunction order is reversed with instructions to dissolve the permanent injunction.

ROBB, J. (dissenting): The majority opinion in this consolidated case appears to me to be an effort to reverse the trial court and yet cover the questions which were involved in the appeal from the corporation commission to that court. My opinion has always been that the supreme court deals primarily with questions of law in such an appeal, and proceeding on that premise, I think the principal question now before us is whether the trial court acted illegally in entering its order reflected in paragraph (4) of its journal entry of judgment dated January 4, 1961, holding the commission's orders of May 27, 1960, and June 29, 1960, were to be set aside because they were unreasonable and unlawful in the respects set forth in the referee's report submitted to the district court in December, 1960.

My first disagreement with the majority opinion goes to the fundamental element of establishing a rate base wherein the value of the property used by a public utility in providing service to the consuming public is determined under G. S. 1949, 66-110 and 66-128. The value of such property is to be the *reasonable value* and the latter statute sets out what the corporation commission may consider in arriving at such reasonable value. Our previous case of *State, ex rel., v. Telephone Co.,* 115 Kan. 236, 282, 223 Pac. 771, interpreted the statute as meaning that the original cost was not the measure of reasonable value resulting in a reasonable rate. There can be no quarrel with the authority supporting the majority opinion that the United States Supreme Court has ruled the replacement or reproduction cost also is not the reasonable value but that the original cost may be considered. Thus we have two distinct but separate poles of limitation. In this case the commission established the original cost as the reasonable value which, under the circumstances, happens to be the lowest value. Under G. S. 1949, 66-118b to 66-118l, inclusive, the district court, on appeal thereto, has authority to review the reasonableness and lawfulness of the commission's determination of the value of the company's property, which was done in this case. The district court likewise has the

power to set aside such order if it is found to be unlawful and unreasonable, which was done in this case. Thereafter the agrieved party may, and did, appeal to this court and we have the same jurisdiction herein *as in other civil actions.* ( G. S. 1949, 66-118d. ) Thus it is our duty to determine whether there is sufficient evidence to uphold the trial court's judgment in regard to fixing the value of the company's property and further, we must determine whether the trial court acted legally or illegally. This matter was very well presented before this court by capable counsel on both sides, the record was meticulously abstracted and has been presented to us in four printed volumes together with numerous exhibits. There is expert testimony by especially well qualified witnesses and, as is usually the case, divergent views were expressed by the different witnesses. In view of this record I cannot, and will not, consider that the trial court did not have ample and sufficient evidence upon which to base its opinion that the commission's order was unreasonable and unlawful. It may be noted the commission made certain allowances for equipment outlays, replaced or reproduced on the basis of the original cost thereof because the replacement or reproduction thereof was so recent it was impossible to value it otherwise.

Under the authorities set out in the majority opinion, I am of the firm conviction that somewhere in between the limitation the commission deemed reasonable value based on original cost, less depreciation, and the other limitation of replacement and reproduction value, less depreciation, used by the trial court, is to be found what the legislature meant in sections 66-110 and 66-128 when it used the words, "reasonable value." I believe this in-between value is the value that should be used as the actual "reasonable value" of the company's property when figuring the rate base. This interpretation of the legislative intent would be applicable during both inflationary or deflationary periods of our economy as obviously it is only coincidental here that the original cost, less depreciation, is also the lowest value.

It may be suggested that any error in figuring the rate base may be corrected by shuffling the rate of return and thereby making up the difference between the actual reasonable value of the property and what it is held to be in this particular case, but I know of no such provision in the public utility law and none has been shown to me. It appears that if such were the law, courts would need no definite rules whatsoever governing the commission's treatment

of rates of public utilities and such statutes would be meaningless.

Other matters which the majority opinion deems to be insignificant should be applied in favor of the trial court's ruling and not in an attempt to set aside its ruling and usurp the jurisdiction of that court by finding the commission's interpretation is correct and should, therefore, be affirmed, and the judgment of the trial court should be reversed.

In my opinion the trial court should be affirmed after its judgment has been modified to the following extent: That instead of making its own determination of the reasonable value of the property, the trial court should follow the procedure under 66-118k so as to give the company an opportunity to value its property reasonably instead of following the previous telephone case, and also give the commission an opportunity to correct its unlawful and unreasonable determination of such value. The legislature has given us ample tools with which to handle such matters and this court should see that the statutes are strictly adhered to. I would, therefore, affirm, as modified, the judgment of the trial court.